[No. 10573. *En Banc.* September 26, 1912.]

J. A. PAINE, *Appellant*, v. THE PORT OF SEATTLE et al., *Respondents.*[1]

MUNICIPAL CORPORATIONS—CREATION—PORT DISTRICTS—CONSTITUTIONAL LAW—INHERENT LEGISLATIVE POWERS. The port district act, Laws 1911, p. 412, authorizing the creation of port districts as municipal corporations, is not unconstitutional as creating municipal corporations not recognized by the constitution, there being no express constitutional prohibition against the creation of municipal corporations other than counties, cities, towns and school districts specifically named in the constitution, and the creation of municipal corporations being an inherent legislative power without express authority therefor; especially in view of the fact that the constitutional provisions respecting counties, cities, towns and school districts only regulate and do not expressly authorize their creation, and in view of Const. art. 8, § 6, referring to "other municipal corporations" than those specially mentioned.

[1]Reported in 126 Pac. 628; 127 Pac. 580.

SAME—CREATION OF PORT DISTRICTS—CONSTITUTIONALITY OF ACT—
PARTIAL VALIDITY—ACTION—PLEADING—COMPLAINT.    The port dis-
trict act, Laws 1911, p. 412, authorizing the creation of port districts
with power to make harbor improvements coincident or concurrent,
to some extent, with the powers of counties and cities, is not void in
its entirety from the mere fact that the port district may, in whole or
in part, occupy the same territory as, and be superimposed upon
another municipal corporation or corporations limited by the consti-
tution in the amount of the expenditures that may be incurred for
improvements of the same nature; and a complaint questioning the
validity of a port district and its proposed indebtedness is insufficient
where it does not appear that the indebtedness proposed would, with
the existing indebtedness of the other municipality, exceed the consti-
tutional limit.

APPEAL—BRIEFS—PRESENTATION OF QUESTIONS.    Important and
far-reaching constitutional questions are not sufficiently presented
to call for a decision, when presented in a perfunctory manner with-
in the compass of two pages of the brief, and without the citation
of any authority; especially if moot questions, not controlling the
real issues.

MUNICIPAL CORPORATIONS—CREATION OF PORT DISTRICT—ELECTION
—VALIDITY—DESIGNATION OF POLLING PLACE—NOTICE.    A port dis-
trict election is not invalidated by the failure to show that county
commissioners designated the polling places "by resolution," where
it appears that the clerk of the board made arrangements for the
polling places, the board allowed and paid rent therefor, and a fair
expression of the wishes of the voters was not interfered with; nor
by the fact that no notice of the polling places was given, when the
statute did not require notice, and there was no claim of fraud or
unfairness.

SAME—NOTICE OF REGISTRATION.    Irregularity in a port district
election in that in a few small towns no notice of opening
the registration polls was given as required by Rem. & Bal. Code,
§ 4765, does not invalidate the election, where it appears that all
but a few hundred voters in such town voted, and the vote carried
by a majority of over nine thousand.

SAME—BALLOTS—FORM.    A port district election is not invali-
dated by the failure of the ballots to conform strictly to the expres-
sions prescribed by law, and the fact that they contained other mat-
ter, where the matter was explanatory and did not mislead, but
rendered the question submitted clear and certain.

SAME—CANVASS OF RETURNS.    A port district election is not in-
validated by an irregularity in the canvassing of the votes, the
canvass being made by the general election board instead of the
county commissioners as required by the port district act, in the

absence of an allegation that the canvass made was incorrect and changed the result.

SAME—ELECTION—INDEBTEDNESS INCURRED—LIMITATIONS. An election to authorize the incurring of indebtedness by a port district is not invalidated in that the debt exceeded the statutory limit of two and one-half per cent of the assessed valuation of property within the district, where it appears that eight distinct propositions were voted on, and the aggregate indebtedness for all the propositions, exclusive of the last one, was within the limitation, and no other debt was contemplated or threatened; and the last proposition was separate from and additional to the others and contingent and expressly conditioned upon the event that, at some future time, the district should have the necessary legal authority and right to incur the indebtedness.

SAME—PUBLIC IMPROVEMENTS — SUBMISSION TO VOTERS — PLANS ADOPTED—SUFFICIENCY. Laws 1911, p. 423, § 9, requiring the port commission to adopt detailed plans and an estimate of the expense of the proposed improvement and submit the same to the voters, as a prerequisite to the incurring of indebtedness, is satisfied by the adoption of plans that fairly inform the voters of the nature and extent of the proposed improvement, and it is not essential that plans be adopted in such detail as necessary for the final construction of the improvement.

SAME—PUBLIC IMPROVEMENTS—SUBMISSION TO VOTERS — RESOLUTION—LEVY OF TAX. A resolution of a port district commission for the issuance and sale of bonds, providing that the net income shall be applied to the payment of principal and interest on the bonds from year to year, and a tax levied annually for support to pay the balance of the interest and bonds annually maturing, does not constitute the levy of a tax, but is nothing more than a pledge that the tax will be levied to make up any deficiency in the income.

SAME—PUBLIC IMPROVEMENTS—BONDS—INTEREST—SALE AT DISCOUNT. The port district act not providing the rate of interest that the commission may authorize on bonds sold, the commission will not be enjoined from selling at a discount bonds drawing four and one-half per cent interest, the limit specified in the resolution calling the election, where it is not alleged that the discount allowed will make usurious interest, the general powers of the commission clearly including the power to regulate the rate of interest, and there being nothing in the resolution respecting the rate at which the bonds should be sold.

APPEAL—REVIEW—AMENDMENTS PRESUMED. The supreme court may treat the complaint as amended and consider all questions that were deemed within the issues and determined on the merits in the lower court.

MUNICIPAL CORPORATIONS—INDEBTEDNESS— CONSTITUTIONAL LIMIT —SUPERIMPOSED MUNICIPALITIES. The constitutional provision that no county, town, school district, or other municipal corporation shall become indebted to an amount exceeding a certain per centum of its taxable property, fixes a separate limitation for each corporation named which is not affected by the indebtedness of the different municipalities having jurisdiction over the territory on which it is superimposed, if the legislature did not abuse its power by providing for the creation of a municipal corporation for the sole purpose of avoiding the constitutional limitation of indebtedness.

SAME. A port district covering an entire county, is a municipal corporation having an independent existence with power to incur indebtedness on its own account up to the constitutional limitation, and its creation is not an abuse of the power of the legislature in that it was created to avoid the constitutional limitation of indebtedness of the municipal corporations upon whose territory it was superimposed, where they were created for entirely different purposes, and its chief object was to provide public terminal facilities for both sea and land commerce, although the municipalities upon which it was superimposed had somewhat similar powers respecting the acquisition of such facilities.

MUNICIPAL CORPORATIONS—PROPERTY—ACQUISITION—PRIVATE PURPOSES—LEASES—LOAN OF CREDIT. The borrowing of money for the purpose of acquiring sites for docks, wharves, and other public structures is a municipal purpose as well as a public purpose, and is not a loaning of municipal credit to an individual, within the meaning of the constitution, notwithstanding they were to be leased for a limited time to private persons; and the private uses of the lessee would not affect the validity of the bonds issued to acquire or construct them, if they were not acquired or constructed for the sole purpose of leasing, and the power was reserved to regulate wharfage charges.

MUNICIPAL CORPORATIONS—INDEBTEDNESS AND BONDS — POWERS— RESTRICTIONS—STATUTES—CONSTRUCTION. Laws 1911, p. 418, § 4, empowering a port district to acquire or construct systems of sea walls, jetties, wharves, docks, ferries, canals, locks, tidal basins and other rail and water transfer and terminal facilities, and to issue local improvement bonds to pay for the same, contains a seeming inconsistency in also providing that no bonds shall ever be issued for the acquiring of any "dock or wharf" until such dock or wharf has been leased upon terms which will produce a net income sufficient to pay the bonds at maturity and the interest thereon, in view of the requirement in § 6 of the preliminary adoption of a comprehensive plan or scheme of the entire system; and such limitation as to docks and wharves can have no application, where a comprehensive scheme has been adopted, as required by § 6, in which there is no

possibility of separating the earnings of the dock or wharf from the earnings of the other facilities making up the entire system; and hence it must be construed to apply only where a dock or wharf is acquired separately or together without the other facilities.

MUNICIPAL CORPORATIONS—IMPROVEMENTS — PORT DISTRICTS — IN-DEBTEDNESS—SUBMISSION—PROCEEDINGS. The submission of the question of incurring indebtedness by a port district under Laws 1911, p. 418, §4, is authorized after the adoption of the "comprehensive scheme" provided for in § 6, and prior to the adoption of the "detail plans" provided for in § 9.

Appeal from a judgment of the superior court for King county, Myers, J., entered July 16, 1912, upon sustaining a demurrer to the complaint, dismissing an action for an injunction. Affirmed.

*Ballinger, Battle, Hulbert & Shorts*, for appellant.

*Preston & Thorgrimson*, for respondents.

PARKER, J.—This action was commenced in the superior court for King county, by the plaintiff, a taxpayer, seeking an injunction restraining the issuance and sale of certain bonds of the port district of Seattle, which the commissioners of that district propose to issue and sell to procure funds with which to purchase property and construct improvements for the district. The defendants demurred to the plaintiff's complaint upon the ground that the facts stated therein do not constitute a cause of action. The demurrer was sustained by the court, and the plaintiff electing to stand upon his complaint and not plead further, a judgment of dismissal was thereupon rendered against him, from which he has appealed to this court. The numerous contentions made by counsel for appellant have to do with the constitutionality of the law authorizing the establishment of port districts; the validity of the election held to create the port district of Seattle; the validity of the election held to authorize the incurring of the debts and issuing of the bonds here involved; and the validity of certain acts and proceedings of the port commissioners looking to the issuance

and sale of certain of the bonds in pursuance of the result of the election. We will notice the several questions relating to these subjects in this order, and will refer to the facts alleged in the complaint, so far as may become necessary in our discussion of each of the questions separately. The law here involved is the port district act, found in the Laws of 1911 at page 412. Its general scope or purpose is fairly stated in its title as follows:

"An act authorizing the establishment of port districts, providing for the acquirement, construction, maintenance, operation, development and regulation of a system of harbor improvements and rail and water transfer and terminal facilities within such districts, and providing the method of payment therefor."

This law authorizes the creation of port districts as municipal corporations with defined powers to be exercised by a board of three commissioners.

It is contended by counsel for appellant that this law is unconstitutional and for that reason void, because it provides for the creation of a municipal corporation not recognized by the state constitution. Our attention is called to certain provisions of the constitution wherein counties, cities, towns and school districts are specifically named and recognized as municipal or public corporations, and also to the fact that no others are specifically named in the constitution. It is argued that this in effect is an implied prohibition against the creation of other municipal corporations. No constitutional provision has come to our notice, and we feel quite sure there is none, which in terms prohibits the legislature from providing for the creation of other municipal corporations than those specifically named in the constitution. Indeed, it is apparent from a reading of the several provisions of the constitution wherein we find counties, cities, towns and school districts specifically named, that those provisions were adopted for the purpose of prescribing the duties of the legislature in making provisions for the

organization of such corporations and not for the purpose of conferring upon the legislature the power to provide for their creation. The language of the constitution, in so far as it relates to these specifically named corporations, clearly manifests an assumption on the part of the framers of that document that the legislature has the inherent power to provide for the creation of those specifically named corporations without any express power in the constitution. For instance, in § 4, article 11, we read:

"The legislature shall establish a system of county government, which shall be uniform throughout the state, . . . "

And in § 10, article 11, it is provided:

"Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, . . "

We find no constitutional provision referring to creation of school districts as municipal corporations, other than the possible inference to be drawn from the language of § 2, article 9, providing:

"The legislature shall provide for a general and uniform system of public schools."

These constitutional provisions, which come as near being specific expressions of legislative power to create municipal corporations as can be found in the constitution, it seems to us were clearly intended to be nothing more than declarations of mandatory duty placed upon the legislature to exercise, and exercise in a prescribed manner, certain inherent powers which it was assumed that the legislature possessed without any grant of power in the constitution other than such general grant of legislative power as necessarily follows from the mere fact of the creation of a legislative department of government, or from the expressed grant of general legislative power found in § 1, article 2, of the constitution as follows:

"The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington."

Not only has the constitution failed to grant in specific terms power to the legislature to provide for the creation of these named corporations and thereby possibly inferentially prohibit the creation of others, and also failed to prohibit the creation of others by any express declaration, but by language clear and certain has raised a strong inference that there may be other municipal corporations created in pursuance of legislative enactment. In § 6, article 8, we read:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, . . ."

The words "other municipal corporations" as here used evidently have reference to others than the ones specifically named, and it will be noticed this provision names counties, cities, towns and school districts. It is elementary constitutional law that the legislature of a state may enact any law not expressly or inferentially prohibited by the constitution of the state or nation. This doctrine is clearly stated in Cooley's Constitutional Limitations (7th ed.), p. 241, as follows:

"In every sovereign state there resides an absolute and uncontrolled power of legislation. In Great Britain this complete power rests in the Parliament; in the American States it resides in the people themselves as an organized body politic. But the people, by creating the constitution of the United States, have delegated this power as to certain subjects, and under certain restrictions, to the Congress of

the Union; and that portion they cannot resume, except as it may be done through amendment of the national constitution. For the exercise of the legislative power, subject to this limitation, they create, by their state constitution, a legislative department upon which they confer it; and granting it in general terms, they must be understood to grant the whole legislative power which they possessed, except so far as at the same time they saw fit to impose restrictions. While, therefore, the Parliament of Britain possesses completely the absolute and uncontrolled power of legislation, the legislative bodies of the American States possess the same power, except, *first*, as it may have been limited by the constitution of the United States; and, *second*, as it may have been limited by the constitution of the state."

That the enactment of laws providing for the creation of municipal and public corporations is within this inherent legislative power we think is not subject to serious dispute. *Straw v. Harris*, 54 Ore. 424, 103 Pac. 777; *In re Madera Irrigation District*, 92 Cal. 296, 28 Pac. 272, 675, 27 Am. St. 106, 14 L. R. A. 755; *Cook v. Port of Portland*, 20 Ore. 580, 27 Pac. 263, 13 L. R. A. 533; *Wilson v. Board of Trustees of Sanitary District*, 133 Ill. 443, 27 N. E. 203; 28 Cyc. 135, 139. We are of the opinion that the legislature has ample power under our constitution to enact laws providing for the creation of municipal corporations other than counties, cities and towns and school districts, and that this law is not unconstitutional because of such want of general power.

It is contended by counsel for appellant that "The Port District Act is unconstitutional and void in that it authorizes, by the subterfuge of superimposing a new municipal corporation upon an existing municipal corporation, the creation of indebtedness upon the same territory, for the same purpose, in excess of the constitutional limitation of municipal indebtedness prescribed in § 6, article 8 of the constitution." This contention is rested entirely upon the following allegations of the complaint:

"That the corporate limits of said port district are co-extensive with the corporate limits of King county; that the entire area within the corporate limits of the city of Seattle is embraced within the corporate limits of said port district; that the entire area within the corporate limits of School District No. 1, a municipal corporation, which are co-extensive with the corporate limits of the city of Seattle, is embraced within the limits of said port district, and that the entire area of one hundred sixty-seven (167) other school districts, all municipal corporations, and the entire area within the incorporated limits of the incorporated cities and towns mentioned the corporate limits of said port district; that said port district act pretends to vest said port district with the authority to incur indebtedness for some, or all, of the purposes for which one or more of the other aforesaid municipal corporations may incur indebtedness; that those parts of said port district act which authorize said port district to incur indebtedness are unconstitutional and void in this; that they vest in said port district, as aforesaid, the authority to increase the indebtedness charged upon territory affected beyond the limits of indebtedness imposed upon municipal corporations by section 6 of article 8 of the state constitution, and that by reason of said parts of said act being unconstitutional, said act is unconstitutional in its entirety, and all proceedings had and proposed to be had by said commission and said port district should be declared illegal and void."

Nothing could be plainer than that these allegations do not present a question of actual threatened violation of the debt limit prescribed by § 6, article 8, of the state constitution above quoted. All of these facts may be true, and yet the combined debt of all of the municipal corporations mentioned as being superimposed one upon the other may not, when added to the debt proposed to be incurred by the port district, exceed in amount the constitutional debt limit, computed as if all these municipal corporations were one. Manifestly then we are not here called upon to decide a concrete case of threatened violation of the constitutional debt limit. The only inquiries presented by this contention are these: (1) Does the mere fact that the law by its terms

authorizes the creation of port districts with some of the powers possessed by municipal corporations occupying the same territory, or a portion thereof, render the law unconstitutional in its entirety? (2) Does the mere fact that the law authorizes a port district to incur indebtedness which, if added to the debt of other municipal corporations exercising some of the same powers and occupying the same territory, may exceed the amount of the constitutional debt limit prescribed for a single municipal corporation, render the law unconstitutional in its entirety, or the issuance of the bonds here involved beyond the power of the port district?

Counsel call our attention to the fact that counties and cities already possess, to some extent at least, the same powers for making harbor improvements and incurring indebtedness therefor as this law in terms confers upon port districts; and also to the fact that the debt proposed to be incurred by the port district is at least in part for the construction of improvements which are within the power of both King county and the city of Seattle to construct at public expense. Counsel then proceed to argue that the constitutional debt limit applicable to the port district must be measured by the combined debt of the municipal corporations, at least that of the city, county and port district occupying the same territory; and from their conclusion argue that the law is unconstitutional in its entirety because it thus renders possible the violation of the constitutional debt limit. In their last analysis these contentions amount to nothing more than this: Because a port district may not be able to exercise to the full extent the debt incurring power in terms conferred upon it by this law, the law is unconstitutional in its entirety, and the port district is without legal existence. This is all that is left of the argument; because, as we have seen, in no event do the facts pleaded show a violation of the constitutional debt limit, even if we were to assume that the debt of all these municipal corporations must be measured as if they were one.

Counsel cite in support of their contention: *Orvis v. Board of Park Com'rs of Des Moines*, 88 Iowa 674, 56 N. W. 294, 45 Am. St. 252; and *Reynolds v. City of Waterville*, 92 Me. 292, 42 Atl. 553, which come as near supporting their position as any authority to which our attention has been called. But there was not involved in either of those cases the question of the power of the legislature to authorize the creation of municipal corporations in the same territory occupied by others having to some extent similar powers; but rather the mere power of one of the agencies of a municipal corporation to create a debt of the corporation as though such agency were a distinct corporation. These cases were both decided upon the theory that there was no separate municipal corporation; and in the Iowa case it seems to be inferred that, had the legislature clearly provided that the board of park commissioners should be a municipal corporation separate from the city, the question would be different from the one they were called upon to decide.

Some reliance is also placed upon our decision in *State ex rel. Zylstra v. Clausen*, 66 Wash. 324, 119 Pac. 797. That case presented the question of the measure of the constitutional debt limit, where one school district was superimposed upon the territory of another, to some extent, by consolidation and reorganization. In that case there actually resulted an exceeding of the debt limit when the debt of the old and new district were added together. We have no such concrete case here presented, as we have noticed; and besides, in that case, one municipal corporation was superimposed upon another of exactly the same nature. Such does not appear to be the case here. To just what extent a newly formed corporation which is superimposed upon another, territorially, must differ from it in powers and purposes, in order that the debts of the two may be regarded separately for the purpose of measuring their constitutional debt limit, we are not here called upon to decide. Though it seems that the general powers and purposes of a port dis-

trict, as compared with the general powers of a county or city, are sufficiently different to make it a municipal corporation of quite a different character than either a county or city. We conclude that the law is not unconstitutional because by its terms it gives to a port district some of the powers and authorizes it to make expenditures and incur indebtedness for some of the things for which a county and city may make expenditures and incur indebtedness. We think the facts pleaded do not call for our decision upon any other question than this, in so far as counsel are relying upon the provisions of the constitution limiting the debt which municipal corporations may incur.

Counsel for appellant contend that the law is unconstitutional in that it authorizes the port district to give its money and loan its credit in aid of private parties; in that the law confers upon the port district the power of eminent domain to acquire private property for that purpose; in that the law authorizes the incurring of indebtedness for other than strictly municipal purposes; and in that the law authorizes the port district to create local improvement districts to pay for improvements by local assessments, when none of the improvements it is authorized to make would in fact be local improvements such as in law would support local assessments to pay therefor. These important and far-reaching questions are all presented by assertions made practically without argument and without the citation of a single authority, within the compass of two pages in appellant's brief. It is probably enough for us to say that we do not regard such a perfunctory presentation of questions of such great moment as requiring an expression of our opinion thereon. Besides, if we did assume to decide them, our decision would be nothing but an expression of opinion upon moot questions, not controlling any of the real issues presented by the facts pleaded in this case. It is manifest that, notwithstanding the port district of Seattle may be authorized by this law to loan its credit to some extent in aid of private parties;

notwithstanding the law may in terms give to the port district the power of eminent domain beyond that which it can constitutionally exercise; notwithstanding the port district may, to some extent, under the terms of this law, incur indebtedness for purposes not strictly municipal; and notwithstanding the port district may not possess any constitutional power of local assessment whatever which the law in terms grants; still the port district could have a legal existence and could incur the indebtedness it now proposes to incur without the validity of that indebtedness being affected by any of these questions, so far as appears from the facts alleged in this complaint. We must decline to regard any of these questions as being properly before us in this case.

It is alleged that, in the election held to create the port district, the county commissioners "did not, by either resolution or motion of record, designate polling places, as required by law." It is admitted, however, that the county auditor made arrangements for such polling places in each voting precinct, and that the county commissioners thereafter audited and ordered paid the rent for such polling places. The port district act is silent as to how the polling places shall be designated. Section 4798, Rem. & Bal. Code, is relied upon by counsel for appellant as showing the legal necessity for the county commissioners designating polling places by recorded resolution or motion, where it is provided that they "shall designate one voting place in each precinct." Assuming that this section applies to an election of this nature, it will be noticed that it is not alleged that the commissioners did not designate the polling places, but only that they did not do so by recorded resolution or motion. The statute is silent on this question. In view of the fact that the auditor, the clerk of the board of county commissioners, made arrangements for the polling places, and that they thereafter allowed and ordered paid the rent for such polling places, we must presume that he acted by their

authority and that they approved his acts in that regard. It is not claimed that the polling places were designated in any unfair manner, or that their place of designation in the least interfered with a fair expression of the wishes of the voters at the election. We think this did not avoid the election.

It is alleged that no notice of the polling places in the several voting precincts was given for the election to establish the port district, and that the election was thereby rendered illegal. Our attention has not been called to any statutory provision requiring any such notice. We have noticed that there is no claim of fraud or unfairness in the location of the voting precincts, and manifestly want of notice of their locations would not avoid the election when the claimed duty of election officers is not rested upon some statutory requirement.

It is alleged that in some of the smaller cities and towns of the port district no notice was given of the opening of the registration poll books during the year in which the election for the establishment of the port district was held, and that such failure of notice rendered the election void. Our attention is called to § 4765, Rem. & Bal. Code, requiring city and town clerks to publish such notice. Even if we should assume that this requirement is anything more than directory, it, in any event, would not affect the result, for it is plain from the facts alleged in the complaint that all but a total of a few hundred of the voters in all such cities and towns voted at the election, and that the establishment of the port district was carried by a majority of over 9,000 votes. Clearly this irregularity could in no event have affected the result, and therefore did not affect the validity of the election.

The port district act provides:

"In submitting the said question to the voters for their approval or rejection, the proposition shall be expressed on said ballot in the following terms: . . . 'Port of . . . . . . . .

Yes;' 'Port of ........No' (giving the name of the principal seaport city within such proposed port district, or if there be more than one city of the same class within such district, such name as may be determined by the board of county commissioners.)"

It is alleged that in the printed form of the ballot used in the election for the creation of the district the question was submitted in this form:

"Special County Election.
"King County, State of Washington,
"Tuesday, Sept. A. D. 1911.
"Instructions to Voters.
"Place a cross (X) in the square [] after word 'yes' if you desire to vote for 'Port of Seattle.' Place a cross (X) in the [] after word 'no' if you desire to vote against 'Port of Seattle.'
" 'Shall a port district be created in King county for the acquirement, construction, maintenance, operation, development and regulation of a system of harbor improvements and rail and water transfer and terminal facilities to be known as the 'Port of Seattle,' under the provisions of Chapter 92, Session Laws of Washington, 1911?'
"Port of Seattle ...............'Yes' []
"Port of Seattle ...............'No' []'"

It is contended that this form of submission of the question was in violation of the statute. It is argued that the ballot was rendered void by the fact that it contained matter other than the mere words "Port of Seattle........'Yes' "; "Port of Seattle........'No.' " The act does not prohibit putting any other matter or words on the ballot, and it seems clear that any such matter which does not mislead, but renders the question submitted clear and certain as this does, will not render the election void. We conclude that the ballot fairly and legally stated the question to be voted upon.

The port district act provides:

"If at such election a majority of the voters voting upon such proposition shall vote in favor of the formation of such

.district, the board of county commissioners shall also declare in its canvass of its returns of such elections, and such port district shall then be and become a municipal corporation." Laws 1911, p. 414, § 3.

This, it is contended, makes the county commissioners a canvassing board to canvass the returns of the election. There is no other provision in the act upon that subject. It is alleged that the commissioners did not canvass the returns; but that they were canvassed by the chairman of the commissioners, county auditor, and prosecuting attorney. These officers constitute the regular county canvassing board as provided by the general law. Rem. & Bal. Code, § 4932. No claim is made that the vote cast at the election for the establishment of the district was different from that found by the canvassing board as thus constituted, which was 13,799 votes in favor of, and 4,539 votes against, the establishing of the district. Appellant not having challenged the fact that the district was established by a majority vote of the voters voting upon that question, he is not in position to claim that the port district has no legal existence because of an irregularity in the canvassing of the votes. The result of the election established the district and not the declaration of that result by the canvassers. What we have said relative to the election for the creation of the district applies equally to objections made to the validity of the election held to authorize the incurring of the indebtedness here involved, each of the indebtedness propositions there submitted having been carried by a much larger majority.

The questions discussed and decided in the case of *Murphy v. Spokane*, 64 Wash. 681, 117 Pac. 476, and authorities there cited, support our conclusion upon the questions here raised touching the regularity and validity of these elections. At pages 686, Justice Morris, speaking for the court, said:

"The principle underlying all these decisions is that the rights of the voters should not be prejudiced by the errors or wrongful acts of the election officers, unless it be made to appear that a fair election was prevented by reason of the alleged irregularities."

It is contended that the debt limit of 2½ per cent of the assessed value of the taxable property of the district, that being the debt limit prescribed by § 4 of the port district law, will be exceeded by the incurring of this proposed debt, and that, therefore, all of it is unauthorized and cannot be lawfully incurred. If the incurring of the entire indebtedness had been submitted to the electors as one proposition and it had all been authorized by the voters unqualifiedly, there would be ground for this contention. It appears, however, by the allegations of the complaint, that there were eight separate and distinct propositions submitted to the voters at the election, each of which was voted upon separately, and each of which was carried by a majority of 16,000 or more. These propositions were numbered from one to eight. Proposition one submitted to the voters for ratification or rejection a comprehensive scheme of harbor improvements, consisting of six independent improvements or "units" as they were termed. This first proposition did not involve the question of incurring indebtedness. Propositions 2 to 7, inclusive, submitted to the voters for ratification or rejection, separate and distinct from each other, the questions of incurring indebtedness to construct the following unit improvements.

| | | |
|---|---|---:|
| (2) | Smith's Cove improvement | $1,000,000 |
| (3) | East Waterway improvement | 850,000 |
| (4) | Salmon Bay improvement | 350,000 |
| (5) | Central Water Front improvement | 750,000 |
| (6) | Lake Washington improvement | 150,000 |
| (7) | Harbor Island improvement | 3,000,000 |

The total of these being ................$6,100,000

The total 2½ per cent statutory debt limit, computed upon
the assessed valuation of the property within the district,
is $6,466,000. So it is plain that the total of the several
debts authorized to be incurred to construct these improve-
ments will be within the statutory debt limit. The con-
struction of these improvements is authorized by the elec-
tion without qualification, and it is contemplated that they
all be constructed in the immediate future as soon as prac-
ticable. It is also plain that each is to be constructed and
thereafter operated entirely independent of the others.
Proposition No. 8 was also submitted separately. This au-
thorizes the construction of what is termed "Harbor Island
supplemental improvement." The general nature and the
qualified manner of the authorization of this improvement
is fairly expressed in the language of the proposition as
printed upon the ballots as follows:

"Upon the proposition of authorizing the port commis-
sion of the port of Seattle to incur indebtedness and issue
bonds in the sum of $2,000,000 (over and above the indebt-
edness and bond issues described as propositions two, three,
four, five, six and seven, in the resolution of February 7th,
1912, hereinafter referred to) . . . , the said indebted-
ness herein authorized to be actually incurred and bonds
therefor to be actually issued only as and when construction
of said additional piers shall be required to accommodate
shipping traffic, and then only when the said port commis-
sion, acting in behalf of said port of Seattle, shall, at the
time of creating said indebtedness and the issuance of bonds
therefor, have the necessary legal authority and right to do
so."

It is manifest that the adoption of this proposition was
intended to in no way affect the validity of any of the other
debt propositions, and that if the total of all the seven debt
propositions should result in exceeding the statutory debt
limit this one only was to fail. It is plainly an authorization
of a debt over and above that of all of the others. It is as
much a separate debt authorization, and has as little in-
fluence on the others so far as the statutory debt limit is con-

cerned, as if it had been adopted at a separate and later election. We are not here concerned with the question of this proposition exceeding the statutory debt limit, for no claim is made that the port commissioners are contemplating the exercise of any power by virtue of the adoption of this proposition by the voters. Indeed, it is plainly to be inferred from the facts alleged that there will be no occasion to attempt the exercise of any power under the authorization of this proposition for some time in the future. We are of the opinion that there is not at the present time any threat on the part of the port commissioners to incur indebtedness in excess of the statutory debt limit, in view of the fact that they are not proposing to incur any indebtedness other than that which was authorized by the adoption of propositions 2 to 7 inclusive, and proposition 8 being adopted entirely separate from the others, does not render the others void as being in excess of the debt limit. This view is not in conflict with our decision in *Blaine v. Seattle*, 62 Wash. 445, 114 Pac. 164, relied upon by counsel for appellant, these debt propositions being submitted to the electors separately, and the ultimate consummation of one improvement not being dependent on any of the others.

It is contended by counsel for appellant that the commissioners of the port district have failed to adopt plans for the proposed improvement as a prerequisite to the incurring of the debts here involved, as required by § 9 of the port district act. It is there provided:

"Before ordering or aiding any improvement, the cost of which, in excess of fifty per cent, is to be borne by the entire port district, the port commission shall adopt the detail plans, declare the estimated cost thereof, the annual expenditures to be made thereon and if such annual expenditures shall exceed one-half mill of the port district tax levy allowed by this act, based on the assessment valuation for the current year the port commissioner shall and by resolution submit to the electors of the port district at a general or special election, the proposition to so expend the general

funds or issue the general bonds of the district." Laws of 1911, p. 423, § 9.

It might well be argued that this indebtedness was not authorized under the provisions of this section, but under the provisions of § 4 of the act which requires the authorization by a larger majority. But assuming that the plan requirement of § 9 is controlling here, we are informed by the allegations of the complaint that plans were adopted for each of the unit improvements prior to the submission of the indebtedness questions to the electors. It is alleged in the complaint that such plans were adopted by the commissioners:

"Giving the description of the land and the location upon the land of the docks, wharves, and other improvements to be constructed, and giving the respective sizes, shapes and contours of each of said buildings and improvements, and the nature of the material of which the same is to be constructed, and also making an estimate as to the cost of each of said improvements, but said plans fall short of being the detail plans required by the statute, in that neither specifications nor working plans have been prepared by said port commission in sufficient detail to properly call for bids."

This is all of the information the complaint gives us as to the nature and extent of the plans adopted; and while it contains a general allegation that the plans were not such "detail plans required by the statute," it is not pointed out in what respect they were deficient. The allegations as to their nature and extent seem to indicate that they were sufficient, and with no other facts before us, we will assume that they were. We do not think it was necessary that the plans and specifications to be adopted at that time should be such complete detailed plans and specifications as would be necessary to have for the final construction of the improvement. We think the statute is satisfied when the adopted plans are such as to fairly inform the voters of the general nature and extent of the proposed improvement. We are of the opinion that the alleged facts show the adoption of such plans as

satisfies the requirement of § 9, even assuming that that section is controlling here.

The original resolution providing for the holding of an election upon the several indebtedness propositions provided as to each as follows:

"Said bonds, principal and interest, to be payable out of the net income from said improvement, and in case said net income shall not be sufficient for that purpose the remainder shall be payable out of taxes levied upon the property in said port district, and the details of the method of creating and applying said net income and taxes and of creating a proper and sufficient sinking fund for the payment of the principal of said bonds to be as hereafter prescribed by said commission."

It is contended that the commissioners by their resolutions providing for the issuance and sale of the bonds evidencing the indebtedness for the several units, they having adopted a separate resolution as to each unit, have exceeded their authority, in that they have, in effect, by such resolutions, authorized the levy of an annual tax to aid in paying the indebtedness, before there is in fact any deficiency in the income from the improvements to pay the indebtedness. This contention is rested upon the following provisions contained in each resolution adopted by the commissioners for the issuance and sale of the bonds.

"The net income from said improvement shall be paid into the fund hereinafter created, and shall be applied to the payment of the principal and interest of said bonds, and no portion of said net income shall be diverted to any other purpose. There shall be levied in the year 1912 by the port of Seattle, upon all property in said port district subject to taxation, a tax sufficient to pay the interest upon all of said bonds payable during the year 1913, and the principal of all of said bonds maturing during the year 1913, and in the year 1913, and in each year thereafter so long as any of said bonds shall remain unpaid, there shall be levied by said port of Seattle, upon all of the property in said port district subject to taxation, a tax in an amount which together with the net income of said improvement available for such purpose

shall be sufficient to pay the principal of all of said bonds then outstanding which mature in the next following year and the interest of all of said bonds payable during the next following year."

It seems to us that these provisions do not constitute the levy of a tax, but are nothing more than a pledge to the bond-holders that a tax will be levied from year to year sufficient to make up any deficiency in the income from the improvements to pay the interest and principal upon the bonds from time to time as they mature. It is true that for the year 1913 the resolution seems to unqualifiedly provide for the levy of a tax to pay the interest. It is apparent, however, that the commissioners concluded that in no event would there be any income from the improvements, because of their being in the course of construction, prior to the falling due of the interest for that year; but however that may be, if there should be any income prior to that time it would not necessarily follow that a levy for the interest then falling due would be made beyond that which would be sufficient to pay the deficiency. We do not think that these resolutions mean more than this. We conclude that the commissioners have not exceeded their authority in thus making provision for the issuance of the bonds and the levy of a tax to pay the same as may become necessary from year to year.

It is provided in the resolution calling the election upon the several indebtedness propositions that the bonds to be issued in pursuance thereof should bear interest not to exceed the rate of $4\frac{1}{2}$ per cent per annum. It is alleged in the complaint that the commissioners have called for bids for the sale of a part of the bonds, and that they threatened to sell the same below par in the event a better price cannot be received. This, it is contended, amounts to a threat upon the part of the commissioners to dispose of the bonds at such a price that will in effect amount to having them bear a greater rate of interest than $4\frac{1}{2}$ per cent. No facts are alleged, however, warranting us in concluding that the commission-

ers are threatening to so dispose of the bonds as to have the effect of pledging the district to pay usurious interest thereon. The port district act makes no provision for the rate of interest the bonds shall bear, nor does it contain any pro·vision requiring the bonds to be disposed of in any particular manner or at any particular price. The general powers of the commissioners of the port district seem to be clearly sufficient to authorize them to fix the rate of interest, providing it does not exceed usurious interest, nor is there anything in the port district act requiring that this question be submitted to the electors. In the late case of *Kierman v. Portland* (Ore.), 122 Pac. 764, the court said:

"The weight of authority is to the effect that the sale of municipal bonds below par is not illegal, unless the act or ordinance authorizing the issue expressly directs that they shall not be sold for less than par. 'That the bonds of a municipal corporation may be sold by it for less than par must be regarded as a general understanding of lawmakers of the states, as well as the officers of the municipalities, because, when it is desired to prevent such sale, that fact is incorporated in the enabling act or in the ordinance or resolution providing for the issue of the bonds.' Simonton on Munic. Bonds, § 146. See, also, *Yesler v. Seattle*, 1 Wash. 308, 25 Pac. 1014; *City of Lynchburg v. Slaughter*, 75 Va. 57; *City of Memphis v. Bethel* (Tenn.), 17 S. W. 191; *City of Austin v. Nalle*, 85 Tex. 520, 22 S. W. 668, 960."

Assuming that the rate of interest stated in the original resolution upon which the election was held is binding upon the commissioners, so far as the form of the bond is concerned, we think it in any event goes no further than this, since there was nothing therein relating to the price at which the bonds should be disposed of and there is nothing in the port district law to that effect. Therefore, the alleged threat of the commissioners to dispose of the bonds at less than par we think does not warrant our interference. If the allegations of the complaint were such as to render it plain that the commissioners were proposing to dispose of the bonds in such manner that the district might in effect be pledged to

pay usurious interest thereon, there would be a more serious question for our consideration, but the allegations of the complaint do not warrant our assuming such a state of facts. Our decision in *Parkinson v. Seattle School District No. 1,* 28 Wash. 335, 68 Pac. 875, is in harmony with this view, in so far as there is involved the power of the commissioners to fix the rate of interest the bonds shall bear without the submission of that question to the electors.

The judgment is affirmed.

MOUNT, C. J., FULLERTON, and CROW, JJ., concur.

MORRIS, J. (concurring)—I am not in full accord with all that is said in the opinion. Inasmuch, however, as, under my understanding of the issue involved, the only question to be determined is the constitutionality of the act and the sufficiency of the election, and the language to which exception might be taken does not go to either of these questions, but rather to others in my judgment not now properly before us, and seeing no constitutional objection to the act, nor finding any objection to the election which should disturb the result, I therefore concur in the result.

ELLIS and CHADWICK, JJ., concur with MORRIS, J.

ON PETITION FOR MODIFICATION.

[*En Banc.* November 12, 1912.]

FULLERTON, J.—Since the filing of the opinion in this cause, the parties thereto have asked the court either for an expression of its views on certain of the objections to the validity of the bond issue discussed at the argument, but thought by us not to be involved in the case as presented, or to indicate more fully in what particular we deem the record incomplete, so that the same may be so far perfected as to make it properly present these objections. The showing accompanying the requests have convinced us that some, at least, of these objections, if well founded, require a different

judgment from that directed in the former opinion, as they challenge both the power of the corporation to raise the revenues necessary for its corporate existence, and its power to expend such revenues when collected for the purposes it is proposed to expend them. It appears, also, that the trial court deemed these objections as properly within the scope of the issues, as made by the allegations of the complaint and the demurrer thereto, and determined them upon their merits. We have concluded, therefore, that, in view of our liberal statutes relating to consideration of causes on appeal, we may treat the complaint as amended, and review all questions which were deemed within the issues in the court below and determined by that court.

Passing then to the first of these objections, it will be remembered that the port of Seattle, as incorporated, compromises all of the territory embraced within the boundaries of the county of King; that within these boundaries are numerous school districts, several cities and towns incorporated as such, and of course the municipal corporation of the county of King; that all of these incorporations have certain municipal powers, among which is the power to incur indebtedness for carrying out the purposes of their organizations up to a certain per centum of the assessed valuation of the taxable property within their boundaries; that the corporate powers of the port of Seattle are somewhat similar to the powers possessed by certain of these municipalities, particularly the city of Seattle and the county of King; and that the port of Seattle, if it issues the bonds the issuance of which this action is sought to enjoin, will thereby incur an indebtedness which, if added to the indebtedness of the municipalities above specifically named, will exceed the indebtedness permitted by the state constitution for "strictly county, city, town, school district, or other municipal purposes." The inquiry, therefore, is, has this corporation an independent debt limitation under the state constitution, or is its indebtedness confined to that portion of the limitation fixed by the constitution not

taken up by the indebtedness of the municipalities over whose territory it is superimposed.

In *State ex rel. Zylstra v. Clausen*, 66 Wash. 324, 119 Pac. 797, we held that the territory of a school district chargeable with an indebtedness for school purposes could not be chargeable with a further indebtedness which, added to the first, exceeded the constitutional limitation, although the territory had been incorporated into a consolidated district and the further indebtedness was an indebtedness proposed to be created by the consolidated district. This case is cited as controlling the question at bar, but we think it without application. Since the constitution provides that no county, city, town, school district, or other municipal corporation shall become indebted to an amount exceeding a certain per centum of its taxable property, it has seemed to us that it would be a gross perversion of this limitation to allow any such entity, by the simple process of disincorporating and reincorporating, to increase indefinitely the burden of its indebtedness for the prohibited purpose, and for that reason that the principal of the case is sound. But it seems to us equally plain that it was the purpose and intent of the constitution that one of these incorporations could be superimposed upon the territory of the other; that is to say, that a city or town could be superimposed upon the territory of a county, that a school district could be superimposed upon the territory of a county and city or town, and that another municipal corporation, or perhaps more than one, could be superimposed upon the territory of a county, a city or town, and a school district. As to the corporations specifically named, there is no question that each has its own limit of indebtedness under the constitution, notwithstanding the imposition of such indebtedness may increase the gross indebtedness chargeable to the particular territory to a sum equal of each of the limitations taken separately. Now the "other municipal corporation" named in the constitution stands on the same plane as these especially enumerated. The language is that "No

county, city, town, school district, or other municipal corporation shall for any purpose become indebted," to an amount exceeding a certain limitation; and clearly such corporation, when properly and legally organized possesses the same powers as those previously named. This leads to the inevitable conclusion that it has its own limitation of indebtedness and is not affected by the indebtedness of the different municipalities having jurisdiction over the territory on which it is superimposed.

The argument that the legislature, if it is permitted to provide for the organization of municipal corporations other than those specially enumerated in the constitution, may so far abuse the power as to provide for the creation of municipal corporations for the sole purpose of avoiding the limitation of indebtedness enjoined by the constitution, has no weight as applied to the corporation here under consideration. It is plain that this one is not so organized. It has no connection with either the city or county government and has a purpose independent of each of them. The chief purpose of a city or county is civil government, although much latitude may be given them in aid of the execution of their purposes. The object of this incorporation is to provide public terminal facilities for both sea and land commerce, or perhaps better, to provide a place open to the entire public where sea and land traffic may meet for the purposes of exchange. This being its object, we think it may be deemed a municipal corporation having an independent existence, and having power to incur an indebtedness on its own account up to the limitations fixed by the constitution, and the statute authorizing its incorporation.

Section 4 of the port district act authorizes a port district to lease the terminal property to be acquired by it for a term not exceeding thirty years. It is asserted in the brief of the appellant that the respondents contemplate leasing the area known in the record as the Harbor Island improvement

11—70 WASH.

for a thirty-year term, and a part of the east waterway improvement for a term of ten years, and challenges the constitutionality of the statute and the legality of the bonds on the ground that such a transaction on the part of a municipal corporation is to give its money and property and loan its money and credit to a company or corporation in violation of the prohibition contained in § 7, of article 8, of the state constitution; and further, that to borrow money with which to acquire property for the purposes of leasing the same is not a municipal purpose, but a private purpose because of the interpolation of the private interest of such lessee. It has seemed to us that this contention might be dismissed with the statement that the borrowing of money for the purpose of acquiring sites for docks, wharves, and other public structures is clearly a municipal purpose as well as a public purpose, and any suggestion as to the use which may or might be made of such properties after their acquisition would not affect the validity of the bonds issued to raise the money for their acquisition or construction. The real issue being whether the leasing is legal or illegal, the issue can best be determined when it is sought to prevent such a lease being entered into or to avoid it after its consummation. The respondent has however admitted on the record that its purposes in this regard are correctly stated by the appellant, and in view of this it is thought proper to say that the mere fact that the statute permits a leasing for limited periods of property so municipally acquired and owned, is not legally objectionable. Perhaps if the sole purpose of acquiring the property was to lease it to an individual or corporation for private use, its acquisition and lease would be in violation of the constitutional provision cited. But when the purpose is to establish public wharves or docks, and the lease is for a limited time, with power reserved to regulate wharfage charges, as it is in this instance, it cannot be said to be the acquisition of the property for a private purpose nor the giving of money or property or the loaning of the credit of

the municipality to an individual or corporation or within the meaning of this section of the constitution. *In re Mayor etc.*, 135 N. Y. 253, 31 N. E. 1043, 31 Am. St. 825.

Section 4 of the port district act also empowers the district after its due organization "to lay out, construct, condemn, purchase, acquire, add to, maintain, conduct and operate any and all systems of sea walls, jetties, wharves, docks, ferries, canals, locks, tidal basins and other harbor improvements, rail and water transfer and terminal facilities within such port district." It also empowers the district to issue local improvement bonds and provide for their payment by local improvement assessments, and to borrow money and issue bonds in an amount not exceeding two and one-half per centum of the taxable value of all property in such port district, upon three-fifths majority vote of the qualified voters in such district. It then provides that no bonds shall ever be issued to provide for the acquiring of any "dock or wharf" until such commission shall have first negotiated a lease of such "dock or wharf" for a time of not less than ten years upon terms which will produce a net income sufficient to pay the interest on the bond issue as such interest accrues, and create a sinking fund which at a proportionate rate will retire the bonds at maturity, or, if operated directly as a public wharf, the port shall have fixed a schedule of wharfage rates which will produce a sufficient revenue for that purpose. By § 6 of the act, it is made the duty of the port commission provided for in the act, before creating any improvements thereunder, "to adopt a comprehensive scheme of harbor improvements," which after a public hearing and notice shall be submitted for ratification or rejection by the people. The port commission in this instance adopted the "comprehensive scheme" required, which included practically all of the facilities enumerated in the paragraph from § 4 of the act which we have quoted. They also pledged the net revenues of all of the facilities included within the scheme adopted to the payment of the interest and principal on the bonds proposed

to be issued for the acquisition of such facilities. The appellant makes the point that this action on the part of the port commission does not meet the requirement of latter part of § 4 relating to the acquisition and construction of "docks and wharves." We confess to a difficulty in arriving at the meaning of this part of the section. Read by itself, it seems sufficiently clear; but when studied in connection with the remainder of the act, it is utterly incongruous, and if given its literal meaning would destroy the act, owing to the impossibility of carrying its terms into effect. As we have said, the act requires the adoption of a comprehensive scheme of improvements before any action is taken for their acquisition and construction. This scheme must necessarily include, and in the scheme here adopted does include, many facilities in addition to the dock and wharf, and creates the greater part of the proposed expenditure. If this part of the act means, therefore, that the dock or wharf must be dealt with as separate entities, as something apart from the remaining facilities provided for in the comprehensive scheme, then there is no means of carrying the act into effect, as the different facilities making up the entire scheme are so closely related that there is no possibility of separating the earnings of the dock and wharf from the earnings of the other facilities. On the other hand, if the terms "dock and wharf" were intended to embrace all of the facilities provided for the comprehensive scheme, and requires all such facilities to be leased for a sufficient sum to meet the interest upon the bonds as it accrues and retire the same at maturity, then the clause is inconsistent with other provisions of the section which provide for the issuance of local improvement bonds and their payment by local assessments, and other sections of the act which provide for the levying of general taxes by the port district and the retirement of the bonds from the funds so acquired. Seemingly the clause can be given effect only in case the port should acquire a wharf or dock either together or singly, without the acquisition of any of the other enumerated facili-

ties. We conclude, therefore, that, if this clause of the statute has meaning at all, it refers only to those cases where the port acquires a dock or wharf either separately or together, without the acquisition of any additional facilities; and since the bonds in question here are issued in accordance with the other provisions of the act, their validity is not affected whether they are secured or unsecured by a pledge of the net income of a lease of the facilities to be acquired.

In our former opinion, when discussing the question whether the bond issue was invalid because the port commission had failed to adopt "detail plans" for the improvement before submitting the indebtedness question to the electors, we fell into the error of assuming that such plans had been adopted prior to such submission; whereas in fact they had not been so adopted. Certain other plans had seemingly been adopted, but not the "detail plans" provided for in § 9 of the act. But, as we intimated in the opinion, these proceedings were had under § 4 of the act, which unquestionably allows the question of indebtedness to be submitted after the adoption of the "comprehensive scheme" provided for in § 6, and prior to the adoption of the "detail plans" provided for in § 9. We cannot therefore think that the failure to adopt these plans prior to the submission of the indebtedness question to the electors in any way affects the validity of such indebtedness.

The judgment is affirmed.

MOUNT, C. J., PARKER, ELLIS, CROW, and MORRIS, JJ., concur.