[No. 9658. *En Banc.* August 25, 1911.]

JOSEPH MURPHY, *Appellant*, v. THE CITY OF SPOKANE, *Respondent.*[1]

ELECTIONS—CONDUCTING—DUTIES OF OFFICERS — IRREGULARITIES— EFFECT. Where it does not appear that a fair election has been prevented, an election is not invalidated by reason of the failure of the election officers to observe or comply with the statutory requirements that a certain number of election officers be selected and qualified in a specified manner, that they be present at all times, that they take an oath of office, or that the polls be opened on time and kept open during the time prescribed by law, since the provisions are directory merely.

ELECTIONS — CONDUCT — CLOSING POLLS—ACTIONS—PLEADING. An allegation that by reason of the closing of the polls before the time fixed by law many qualified voters were deprived of the right of voting, is not sufficient to invalidate the election, where it does not appear how long before the closing hour the polls were closed, or that any voters coming to the polls before that time were prevented from voting.

ELECTIONS — CONDUCT — OFFICERS — PREJUDICE — PAYMENT OF EXPENSE. The fact that election officers were prejudiced and their appointment influenced by their opinions, and the expense of the election paid by parties interested in the propositions, does not invalidate the election, in the absence of any fraud upon the election itself.

MUNICIPAL CORPORATIONS—FISCAL MANAGEMENT—BONDS — POWER TO ISSUE—SINKING FUND. Rem. & Bal. Code, § 7507, subd. 5, granting to a city power to issue bonds in place of, or to supply means to

[1]Reported in 117 Pac. 476.

meet maturing bonds or for the consolidation or funding of bonds, does not authorize a city, upon the issuance of bonds, to pay for a public improvement costing $875,000, to issue additional bonds in the sum of $125,000 to be placed in a sinking fund and preserved inviolate for fifty years for the purpose of redeeming and paying the other bonds then to become due; since a sinking fund is to be applied to the extinguishment of a principal debt and cannot be created as part of the debt itself.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered May 23, 1911, upon sustaining a demurrer to the complaint, dismissing an action to enjoin the issuance of municipal bonds, after a hearing before the court.    Modified.

*Del Carey Smith* and *Ed Farley*, for appellant.

*Alfred M. Craven* and *Alex M. Winston*, for respondent.

MORRIS, J.—Appellant brought this action to enjoin the city and its officers from issuing and disposing of certain bonds for park purposes, and to declare the bonds illegal because of alleged irregularities in the election at which the proposition to issue the bonds carried. A demurrer was sustained to the complaint, and appellant, refusing to plead further, appeals from the judgment of dismissal. We are therefore only called upon to review the complaint as to whether or no the demurrer was well taken.

The complaint alleges three causes of action, setting forth that, on March 22, 1910, an ordinance was passed, providing for submitting to the electors of the city, at a special municipal election to be held May 3, 1910, a proposition to incur an indebtedness of $1,000,000 for the purpose of acquiring and improving parks, playgrounds, and boulevards, for issuing bonds to evidence such indebtedness, and to create a sinking fund. The election was so held, and the proposition submitted carried. The election is attacked in the first cause of action upon the grounds that, at each of the various election precincts, one or more of the judges and inspectors appointed by the city council failed and neglected to qualify or

serve as such officials, that no other persons were selected in their place, and that in each of the precincts a less number of election officials than the law requires were present; that the judges of election in those precincts where the officials were less than required were prejudiced in favor of incurring the indebtedness; that the election officials were suggested to the common council by citizens who were interested in the success of the proposition, and who promised to pay, and did pay, the compensation of such election officials; that some of the election officials failed and neglected to take the required oath before entering upon their duties; that the submitted proposition would not have carried without the votes from those precincts where these irregularities occurred.

The second cause of action, in so far as it contains new matter, alleges: That the private citizens who suggested the officials nominated by the common council as election officers, and who paid their compensation, were interested in property in and near the city which it is believed they desire to sell to the city for park purposes; that the polling places in some of the precincts were not opened at the time required by law, nor kept open for the required time, and many voters were thus denied the privilege of voting against the bonds. The third cause of action sets forth, that out of the proceeds of the sale of the bonds, $875,000 is to be expended for park purposes and the like, and $125,000 is to be placed in a sinking fund which is to be preserved inviolate for the period of fifty years, for the purpose of redeeming and paying the bonds then to become due. This sinking fund proposition is then attacked upon the ground that there is no authority in the city to establish or create such a fund.

The questions suggested in the first two causes of action are similar and may be treated together, and we are called upon to determine whether such irregularities as are there alleged are fatal to an election, and because of them the election must be held illegal or void. That the complaint alleges irregularities must be admitted, but are they such as to defeat

the election and render nugatory the will of the people as therein expressed? The purpose of an election, whether for men or for measures such as the one before us, is to give effect to the voice of the people; and when the people have spoken, their verdict should not be disturbed by the courts, nor the election in which they have voiced it held void unless it is clearly so. Every election should be carried on under certain rules and regulations adopted by the law-making power to prevent disorder and to afford an opportunity for the expression of the popular will and an ascertainment of the result with certainty. Such rules, however, are generally held to be directory merely, and not so mandatory or jurisdictional in their character as to defeat an election in which they are not wholly observed; and the rule for determining the character of the regulation is given in M'cCrary on Elections, § 225, as:

"If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute, must so hold, whether the particular act in question goes to the merits or affects the result of the election, or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the legislature. But if, as in most cases, that statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election."

This rule is well established by the authorities, and has received recognition in this court in *Seymour v. Tacoma*, 6 Wash. 427, 33 Pac. 1059, where it was sought to invalidate a bond election upon the ground that the notice of election was not such as was required by the ordinance calling the election. The failure was held not to be fatal, and it was said:

"Certain rules as to notice of elections have become well settled, and none of them are better settled than that the

formalities of giving notice, although prescribed by statute, are directory merely, unless there is a declaration that, unless the formalities are observed the election shall be void."

In *Moyer v. Van de Vanter*, 12 Wash. 377, 41 Pac. 60, 50 Am. St. 900, 29 L. R. A. 670, a contest over the office of sheriff, it was sought to set aside the election, among other things, because the election officers in certain precincts failed to place the initials of the inspector or any judge upon the ballots before depositing them in the ballot box, as the law then required; and also the statutory requirement in regard to election booths was not complied with. Both were held to be irregularities not affecting the election. Our election law requires the appointment of two judges and one inspector, who shall constitute the election board in each precinct; and provides, in case those appointed are not present at the opening of the polls, the electors present may choose a board of election. The statute, however, fails to state that any election not so presided over by such or all of such election officers shall be void, and it must be held that the provision is directory merely, and the fact that all of the election precincts did not have their full quota of officials cannot be held to vitiate the election. *Sanders v. Lacks*, 142 Mo. 255, 43 S. W. 653; *Gilleland v. Schuyler*, 9 Kan. 569; *State ex rel. Bancroft v. Stumpf*, 21 Wis.*579.

Neither is it essential to the validity of an election that all the election officers be present at all times during the receiving of the ballots; the absence of one or more of them being held to be an irregularity not affecting the result. *Packwood v. Brownell*, 121 Cal. 478, 53 Pac. 1079; *Anderson v. Likens*, 104 Ky. 699, 47 S. W. 867; *Major v. Barker*, 99 Ky. 305, 35 S. W. 543; *State v. Nicholson*, 102 N. C. 465, 9 S. E. 545; *Tanner v. Deen*, 108 Ga. 95, 33 S. E. 832; *Lee v. State*, 49 Ala. 43; *Thompson v. Ewing*, 1 Brewster (Pa.) 67.

The law prescribes that each of the election officers, before entering upon the discharge of his duties, shall take and subscribe to an oath the form of which is given in the statute;

but it has uniformly been held that the failure to take such oath, in the absence of any such provision of the law, shall not be held to defeat the election nor disturb its results; such officers, though unsworn, being held to be *de facto* if not *de jure* officers. *Taylor v. Taylor*, 10 Minn. 107; *People ex rel. Lee v. Prewett*, 124 Cal. 7, 56 Pac. 619; *Sanders v. Lacks, supra; Rounds v. Smart*, 71 Me. 380; *People ex rel. Fuller v. Hilliard*, 29 Ill. 413. Nor will the election be declared illegal because the election officers were not duly chosen or were not qualified. *Wells v. Taylor*, 5 Mont. 202, 3 Pac. 255; *Thompson v. Ewing, supra.* The failure to open the polls on time, and to keep them open during the time prescribed in the law, is likewise held to be such an irregularity as will not vitiate the election. *Pickett v. Russell*, 42 Fla. 116, 28 South. 764; *Graham v. Graham*, 24 Ky. Law 548, 68 S. W. 1093; *Holland v. Davies*, 36 Ark. 446; *Fry v. Booth*, 19 Ohio St. 25; *People ex rel. Fisher v. Hasbrouck*, 12 Misc. Rep. 188, 47 N. Y. Supp. 109.

In *State ex rel. Bailey v. Smith*, 4 Wash. 661, 30 Pac. 1064, a contest over a school election, it was held that the provision of the law requiring the polls in such election to be open not later than one o'clock p. m., and closed not earlier than eight p. m., was mandatory; but the election was held valid although the polls closed at seven p. m., it not being shown that, had a larger number of votes been cast, the result would have been different.

The principle underlying all these decisions is that the rights of the voters should not be prejudiced by the errors or wrongful acts of the election officers, unless it be made to appear that a fair election was prevented by reason of the alleged irregularities. It is said, in *Moyer v. Van de Vanter, supra*, that there is

"a clear distinction between those things required of the individual voter and those imposed upon election officers. . . where there has been a substantial compliance with the law on the part of the individual voter, and it is made to appear

that there has been in fact an honest expression of the popu-
lar will, there is a well defined tendency to sustain the same,
although there may have been a failure to comply with some
of the specific provisions of the law upon the part of the
election officers or some of them."

The complaint in this connection avers that, by reason of
closing the polls before the time fixed in the law and in the
notice, many qualified voters were deprived of the right and
privilege of voting against the bonds. It does not appear
how long before the proper closing time the polls were
actually closed; whether one hour, or one minute. Nor does it
appear that any qualified voters came to the polls to vote
before the proper closing hour and were prevented from vot-
ing because the polls were then closed, which would be an al-
legation of a provable fact. To say voters were deprived of
the right to vote is a mere conclusion, unless it be coupled
with a statement of facts showing such actual deprivation.

Neither do we think that the allegation that officers of the
election were prejudiced in favor of the bonding proposition
is sufficient to vitiate the election, without its appearing that
such prejudice was fraudulently employed in preventing a fair
and impartial election. It would be difficult to obtain elec-
tion officers who did not have a sentiment of favoritism or op-
position toward some candidate or measure to be chosen or
defeated at the election. We know of no reason in law why
a man chosen as an election official should refrain from ex-
pressing a choice upon some question to be determined by the
election, nor why his known attitude should disqualify him
or defeat the result of the election, unless it be made to ap-
pear that, by reason of such attitude, a fair and impartial
election was not held. It has been held that the fact that a
candidate for office at the election acts as an election officer
will not defeat the election. *People v. Avery*, 102 Mich. 572,
61 N. W. 4; *Swepston v. Barton*, 39 Ark. 549; *State ex rel.
Murphy v. Bernier*, 98 Minn. 1, 38 N. W. 368. To hold
otherwise would be to say that no good citizen could sit on an

election board where a bonding proposition was submitted to
the people. For it is not only proper but commendable that,
upon such an issue involving the expenditure of large munici-
pal funds, every citizen should form and express an intelligent
opinion as to the merits or demerits of the proposition, and
seek to impress his fellow citizens with a like intelligent view.
Such a course is to be encouraged. If we were permitted to
moralize, we might add that a great fault with the people of
today is that, upon propositions of this character, they vote
blindly and without any sufficient comprehension of the real
situation confronting them or an intelligent grasp of the
true meaning and effect of the question submitted to them.
The more intelligent the vote and the greater the interest
taken in these questions affecting our municipalities, the
greater the benefit to us and to our posterity.

That the appointment of the election officials was in-
fluenced by those in favor of the bonds, and that the expense
of the election was paid by them, will not of itself vitiate the
election. We apprehend that, in all elections, the appointing
power is influenced by men or circumstances in selecting the
election officials. The reason for their selection is unim-
portant, unless it be made to appear that in some way it has
worked a fraud upon the election itself. It has never been
held, so far as any cause has been called to our attention, that
to relieve a municipality of part of its public burden, such as
the payment of necessary expenses, or the raising of needful
public funds, works a fraud in any election which becomes a
part of that expense. The citizens of an entire community
will not be presumed to be bribed to vote for a measure they
would otherwise have opposed because a body of their fellow
citizens undertake to bear the expense of the election. What-
ever their motives may be, the evil—if evil it be—the law will
not presume attaches to the whole body of electors, and fraud-
ulently causes them to change their attitude on any public
question. The law must presume that an intelligent people
is too self-respecting to be improperly influenced by any such

fact. We cannot, therefore, hold that the fact that the expenses of this election were borne by citizens who favored the bonds is of itself sufficient to illegalize the result. This question has often arisen in cases where it has been sought to remove county seats or public structures, upon certain citizens or communities who favored the removal undertaking to bear the entire expense incident thereto, such as donations of land, building of court house, and other public structures. It has never been regarded as having any controlling influence upon the election. *Dishon v. Smith,* 10 Iowa 212; *State ex rel. Newell v. Purdy,* 36 Wis. 213, 17 Am. Rep. 485; *Wells v. Taylor, supra.*

An interesting case cited in many of the above decisions is *People v. Cook,* 14 Barb. 259, and same case on appeal, 8 N. Y. 67, where irregularities of the character here referred to are treated as of no vitiating effect upon the election. See, also, *Patton v. Watkins,* 131 Ala. 387, 31 South. 93, 90 Am. St. 43, where it is held that failing to provide booths for the voters, closing the polls at noon, and permitting an official marker to mark the ballots of many voters, without any oath of their inability to do so, all of which was contrary to the statute, would not render the election invalid. The note to this case gives an exhaustive review of the whole subject. Appellant cites *Commonwealth ex rel. Eades v. Weir,* 15 Pa. County Court 425, as sustaining his contention that the failure of the city to pay the election expenses is fatal to the election. The case does not so hold. The only question before the court in that case was whether the county or the city should pay the expenses of an election involving only a municipal indebtedness. It was held that the city should bear the expense.

This brings us to the last question in the case, the validity of the issue of $125,000 in bonds, the proceeds to be placed in a fund for the purpose of retiring the bonds at their maturity. The plan suggested is unique and, so far as we have been able to find, or as has been suggested by counsel, finds

no parallel in the annals of the law. The city undertakes to sustain its authority in this regard by referring us to certain enumerated powers of the city. Rem. & Bal. Code, § 7507. Subdivision 5 of this section is the only one which could have any possible reference to the present condition. It is that the city shall have power, "To issue bonds in place of, or to supply means to meet maturing bonds or other indebtedness, or for the consolidation or funding of the same." But the purpose of the law, as well as the character of a sinking fund, has been utterly misconceived. A sinking fund is "the aggregate of sums of money (as those arising from particular taxes or sources of revenue) set apart and invested, usually as fixed intervals, for the extinguishment of the debt of a government or corporation by the accumulation of interest." *Elser v. Ft. Worth* (Tex. Civ. App.), 27 S. W. 739. A sinking fund is "a fund arising from particular taxes, imposts or duties, which is appropriated toward the payment of the interest due on a public loan and for the payment of the principal." *Union Pac. R. Co. v. Com'rs Buffalo County*, 9 Neb. 449, 4 N. W. 53; *Brooke v. Philadelphia*, 162 Pa. St. 123, 29 Atl. 387, 24 L. R. A. 781. It is a fund to be applied to the extinguishment of a principal debt, and by no contrivance can it be created as a part of the debt itself. It is a fund provided by accumulation of municipal revenues or by special taxation to meet an existing debt. To create a sinking fund by incurring a debt is the very antithesis of what a sinking fund should be. To allow a municipality to borrow a dollar and at the same time to borrow another dollar with which to retire the first dollar, after a term of fifty years, would be not only unbusinesslike but hazardous in the extreme. Granting the proposed issue of $125,000 bonds the character of a sinking fund, it could not be used by the city for any purpose other than the retirement of the debt. Admitting, but without deciding, that the city could loan the money and accumulate a fund of interest, it would not avail the city, for it would fall far short of an amount necessary to

retire the original issue; for we may assume that the city could not, in a period of fifty years, gather a greater rate of interest than it is paying, and further, that the accumulation of interest would be swallowed up in the retirement of interest coupons.

We attach no importance to the suggestion that the ordinance makes special provision for the creation of a sinking fund. If it had not, it would still have been the duty of the city to do so.

We find, therefore, that plaintiff has no cause of action, except in so far as the issue of $125,000 for a sinking fund is concerned. As to that, the demurrer should have been overruled. In all other respects the judgment below is affirmed. Remanded for modification of judgment.

DUNBAR, C. J., CHADWICK, FULLERTON, ELLIS, CROW, and MOUNT, JJ., concur.