W. Stanley Brown and Daniel E. Finn, Jr., Plaintiffs, *v.* J. P. Morgan & Co., Incorporated, Defendant.*

Supreme Court, Trial Term, New York County, November 25, 1941.

* See, also, 177 Misc. 763.

*Paul E. Kern* [*William V. Hagendorn* of counsel], for the plaintiffs.

*Davis, Polk, Wardwell, Gardiner & Reed* [*Russel S. Coutant* of counsel], for the defendant.

EDER, J. In this action it was stipulated that findings of fact and conclusions of law be waived.

This is an auxiliary suit instituted by plaintiff Brown, as an attachment plaintiff and creditor, and the plaintiff Finn, as sheriff in aid of an attachment as authorized by sections 922 and 943 of the Civil Practice Act. The relevant portion of section 922 provides:

" 1. In the event that the person owing any debt to the defendant, or holding property, effects or things in action of the defendant or interest therein subject to attachment, on which a levy under a warrant has been made, as in this act provided, shall fail or refuse to deliver such personal property attached, or to pay or assign to the sheriff the said debt, effect or thing in action, or interest therein, the sheriff may * * * commence an action or special proceeding to reduce to his actual custody all such personal property capable of manual delivery and to collect, receive and enforce all debts, effects and things in action attached by him * * *."

The plaintiff procured a warrant of attachment against Consorzio di Credito per le Opere Pubbliche (Credit Consortium for Public

Works of Italy), hereafter referred to as Credit Consortium, which is a quasi-governmental organization partaking in some degree of the characteristics of our Reconstruction Finance Corporation. Credit Consortium issued two series of external loan sinking fund seven per cent secured gold bonds, series A, due March 1, 1937, and series B, due March 1, 1947, each bond being for the principal sum of $1,000; these bonds were purchased by the defendant and in turn were sold by it to the public; the bonds were subject to call before the maturity date. By agreement made between Credit Consortium and the defendant, the latter was made the former's fiscal agent. Credit Consortium, at stated intervals, forwarded moneys to the defendant which were deposited with it and credited to the former; the moneys so deposited were to be applied to the payment of the interest coupons and for the redemption of called bonds and for the payment of the commissions and expenses of the defendant in handling and servicing the issue; any surplus remaining was kept to the credit of Credit Consortium.

From time to time, as interest coupons matured, they were paid upon presentment and surrender thereof and so were bonds called for redemption, and also the defendant's commissions and the expenses. Credit Consortium, as obligor, defaulted in the payment of principal and interest and the plaintiff Brown, as the owner of certain bonds and interest coupons, brought suit in this court against Credit Consortium to recover the sum of $10,350 and in said action obtained a warrant of attachment against it and under the warrant of attachment the sheriff levied upon the interest of Credit Consortium in the sum of $14,175 on deposit with the defendant. The defendant failed and refused to turn this sum over to the sheriff and this suit followed; the plaintiff Brown demands judgment that the defendant pay to the plaintiff sheriff a sum sufficient to satisfy his demand for judgment of $10,350, with interest from September 1, 1940, costs and expenses of his action brought against Credit Consortium but not exceeding $14,175; that said money when received by the sheriff be applied by him to the satisfaction of any judgment that may be recovered by the plaintiff Brown in his said action against Credit Consortium.

It appears that three accounts were kept by the defendant for Credit Consortium, viz., a general account, a coupon account and a sinking fund account (so styled); that remittances when received by defendant from Credit Consortium were first credited in full to the general account maintained by Credit Consortium, then the amount of the defendant's commissions was charged out therefrom and the rest transferred and credited to the coupon account or the so styled sinking fund account.

It is claimed by defendant that the moneys in question fall into two categories, *i. e.*, (a) in the amount of $155.17, the balance in the general account of the obligor; (b) that the other fund consists of $11,850, being the balance in a sinking fund account alleged to have been maintained by the defendant for the holders of certain bonds of the obligor, and the defendant maintains that the funds in such alleged sinking fund are trust funds and that each of the bonds which has been called has a beneficial ownership to the extent of $1,000 in that fund and that Credit Consortium has lost all right, title and interest, legal and beneficial, to the moneys and hence they are not subject to the attachment and levy thereunder.

There is the further defense that the defendant is a domestic trust company; that the property which plaintiffs seek to reduce to possession in this action stands on the books of the defendant to the credit of and is held by it for the account of Credit Consortium; that the claim of the plaintiffs is adverse to the person to whose credit the deposit stands and for whose account it is held, namely, Credit Consortium; that plaintiffs have neither procured a restraining order, injunction or other appropriate process against the defendant bank from a court of competent jurisdiction in a cause wherein said Credit Consortium has been made a party or served with process nor have they executed to the defendant in form and with sureties acceptable to it a bond indemnifying it from any and all liability, loss, damage, costs and expenses and on account of the payment or delivery of said deposit to them pursuant to their adverse claim.

This defense, as pleaded, is predicated upon and incorporates the language of subdivision 5 of section 134 of the Banking Law, which deals with notice to any bank or trust company of an adverse claim to a deposit standing on its books to the credit of any person, etc. Upon the trial this defense was withdrawn; it is quite apparent that this statute has no application where the notice and demand for the surrender of the deposit are founded on judicial process, like a warrant of attachment, and the demand for the deposit is made by an officer executing such process; in such a situation, if a third party asserts title to the deposit, sections 696, 698 and 924 of the Civil Practice Act govern in respect of attachment or execution, as the case may be, for in surrendering the deposit to such officer pursuant to judicial process there is no transfer of title to any party; the bank merely places the deposit in *custodia legis* to await ultimate disposition thereof by the court. The statute relied on by the defendant being obviously inapplicable, the withdrawal of this defense was quite proper.

Defendant also asserts a claim " in excess of $500 " against the funds in its hands for expenses as fiscal agents, exclusive of any charge for services, and while no setoff, as such, is pleaded by virtue of a banker's lien (*Matter of Wilkins*, 131 Misc. 188) or counterclaim (Civ. Prac. Act, § 944-a), apparently such is the intent, else the plea serves no purpose; as to whether it refers to a matured or unmatured debt the allegation is rather vague and incomplete as to informatory details. While formerly a bank could not set off a deposit and unmatured debt to it of the depositor as against an attaching creditor of the depositor (*Appleton* v. *National Park Bank*, 122 Misc. 248; affd., 211 App. Div. 708; affd., 241 N. Y. 561), such is no longer the rule since the enactment in 1927 (Laws of 1927, chap. 697) of section 151 of article 6-A of the Debtor and Creditor Law, which allows a right of setoff against unmatured debts, and this defense, therefore, appears to be sufficient.

The last defense pleaded is that on June 10, 1940, and at all times subsequent thereto Credit Consortium was and is a national of Italy within the meaning of the President's Executive Order No. 8389 (as amd. by Executive Order No. 8785); that no license as required by said executive order as amended has been obtained from the Secretary of the Treasury of the United States for the payment to the plaintiffs of the sum demanded in the complaint or of any part thereof, and by such defense the defendant's position necessarily is that such duty rested on the plaintiffs.

That sinking fund moneys are trust funds is well-established law, and if such is the status of the mentioned fund then the levy under the warrant of attachment was without effect and the refusal to honor the attachment and the levy thereunder did not give rise to any cause of action against the defendant.

I am of the opinion, however, that the claim of the defendant that the mentioned moneys constitute a sinking fund is untenable, viewing a sinking fund in its true light. The character and nature of a sinking fund are clearly and succinctly set forth in *Murphy* v. *City of Spokane* (64 Wash. 681; 117 P. 476) and *Clark* v. *City of Philadelphia* (328 Penn. St. 521; 196 A. 384). In the *Clark* case the court defined it as follows: " A sinking fund is one ' instituted and invested in such a manner that its gradual accumulations will enable it to meet and wipe out a debt at maturity' " (p. 529). In the *Murphy* case the court said: " A sinking fund ' is the aggregate of sums of money (as those arising from particular taxes or sources of revenue) set apart and invested, usually at fixed intervals, for the extinguishment of the debt of a government or corporation by the accumulation of interest.' * * * It is a fund to be

applied to the extinguishment of a principal debt, and by no contrivance can it be treated as a part of the debt itself " (p. 690). These are fundamental characteristics of a sinking fund. A " sinking fund " is not created by mere arbitrary nomenclature; the basic legal elements which make it such must exist, else it does not have that effect or status. (*California Gas & Electric Corp.* v. *Union Trust Co.*, 178 Cal. 65; 172 P. 146, 148.)

Credit Consortium did not create a sinking fund of the remittances made to the defendant; nor is there any provision in the contract — sometimes referred to as the basic loan agreement — requiring the defendant to establish a sinking fund or to segregate any moneys for such a fund; the designation of the aforementioned remittances as a " sinking fund " was the mere voluntary creation of the defendant; and it lacked the attributes of a sinking fund for it was not the aggregate of sums of money set apart and invested for the extinguishment of the debt of Credit Consortium through and by means of gradual accumulation of interest, for here the principal itself was, and was to be applied to diverse purposes, namely, principal, interest, commissions and expenses, and the proof shows that it was thus applied. It lacks the requisites essential to create and constitute a sinking fund. (Cases, *supra.*)

Moreover, the proof plainly negatives the claim that the remittances cabled to the defendant by Credit Consortium constituted or were intended to constitute a sinking fund or trust fund to take up called bonds or interest coupons. The undisputed testimony of Keyes, defendant's vice-president, is that when the defendant made drawings for bonds to be redeemed it did not always have an existing or special fund for the purpose, but, rather, depended upon remittances from Credit Consortium to cover, and, indeed, " It was often necessary to make the drawings first." This is sufficiently indicative of the non-existence of a sinking fund and it is adequately attested by the further testimony of Keyes to the effect that when a bond which had been called for redemption was paid, it was paid in the same manner as a coupon was paid, *i. e.*, by check drawn on defendant's New York Trust Company No. 2 account which was an account kept by it for the payment of coupons and bonds of the *many* issues serviced by the defendant; it was not an account or fund established and kept solely for the redeemed bonds and coupons of Credit Consortium, but it was of general application — as Keyes expressed it —" Not only for this issue, but for *all* issues; yes, sir."

The evidence establishes that the practice was this, viz., that when money was received by the defendant, either for coupon purposes or for the payment for redemption purposes, the amounts

remitted, less the commissions, were deposited by the defendant with the New York Trust Company in the No. 2 account and then the defendant's check was drawn against that account; neither that account, nor any check nor any statement contained any indicia, whatever, that the account itself or any payments therefrom constituted a sinking fund or trust fund for the coupons or redeemed bonds of Credit Consortium, or for those of any other issue, for that matter. This No. 2 account represented and was an indiscriminate assembly and commingling of moneys regardless of particular origin; it was simply a *general account* maintained by the defendant to serve it as a convenient vehicle for the payment of coupons as well as sinking fund payments and payments of redeemed bonds and of the *many* issues serviced by it. The account is devoid of the vestments and sanctity which adorn a trust fund, and ingenious reasoning, however forcefully presented, cannot anoint it as such. It is, therefore, my conclusion that the claim that said transmissions comprise a sinking fund and that the moneys therein are trust moneys is without legal stability.

I am also of the opinion that in the circumstances shown that the aforesaid remittances are but ordinary deposits, giving rise, between defendant and Credit Consortium, to the relationship of debtor and creditor, of principal and agent between depositor and bank, and that such deposit of these moneys did not create a trust for the bondholders or interest coupon holders merely because the deposit was made for the purpose of paying interest on the bonds or for the redemption of the called bonds. (*Nacional Financiera, S. A.,* v. *Speyer,* 261 App. Div. 599; *Vladikavkazsky R. Co.* v. *N. Y. Trust Co.,* 263 N. Y. 369.)

The contract between Credit Consortium and the defendant contains no agreement that the remittances made by the former to the latter shall constitute a trust fund for the payment of called bonds or for the payment of interest coupons. Section 5 of article 3 of the contract relates only to interest and provides: " The Obligor will place the sums required for interest on outstanding bonds of each series with its Fiscal Agents in the City of New York at least five days in advance of the due date for payment thereof."

It is true that " No particular form of words is required either to create the trust or to indicate that a trust duty has been assumed." (*Sayer* v. *Wynkoop,* 248 N. Y. 54, 59.) " To constitute a trust there must be either an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created." (*Beaver* v. *Beaver,* 117 N. Y. 421, 428.)

It may be that the defendant as the receiver of the remittances intended them to constitute a trust fund for the mentioned pur-

poses — which is not free of doubt — but " the intention of the owner, and not that of the receiver, is controlling upon the question whether title to the moneys has been transferred and a trust has been created." (*Sayer* v. *Wynkoop, supra,* 59.) In the *Sayer* case the court states that where the owner of moneys delivers them to another upon *an agreement* that they will be paid to a third person, such third person acquires an equitable interest entitling him to have a recovery in an action for money had and received (p. 58). The court further said: " Again, the owner may deposit the moneys with a banker with instructions to apply them in satisfaction of the debt of a third person. In that event, the conventional relationship of debtor and creditor between the banker and the depositor is created, coupled with an agency on the part of the banker to pay the debt, which is revocable at the will of the depositor " (p. 58).

It seems to me that section 5 of article 3 of the aforesaid contract clearly comes within this rule, and in this situation the status of these moneys was that they were the property of Credit Consortium and thus subject to attachment and levy thereunder and the failure and refusal to turn them over to the sheriff authorized the institution of this action against the defendant.

Recognizing the absence of any provision in the basic loan contract for the establishment of a separate sinking fund account or to segregate any moneys therefor, the defendant argues that nevertheless when the remittances of Credit Consortium were received by it, they automatically, and without the need of any additional provision, became a trust fund. I am unable to accept this view which is wanting in authoritative support.

Nor do I think that the defense involving Executive Order No. 8389, as amended, is of much moment. It is to be noted that the action herein is authorized only if the defendant " shall fail or refuse to deliver such personal property attached, or to pay or assign to the sheriff the said debt, effect or thing in action, or interest therein * * *." The object of the action or special proceeding authorized by the statute is to reduce to the sheriff's actual custody and possession all such personal property capable of manual delivery and he may maintain any such action or special proceeding " for that purpose." (Civ. Prac. Act, § 922.) Suit being permitted upon the failure or refusal to deliver such property, judgment must follow against the defendant unless such failure or refusal is supported by some legal justification or is fortified by a condition or circumstances which the law recognizes as such. It is the existence of such a condition that the defendant asserts as a bar to recovery here by virtue of said Executive Order No. 8389,

as amended. (5 Fed. Reg. 1400; U. S. Code Ann. tit. 12, § 95, note [1940 Supp. p. 75].)

Executive Order No. 8389 is popularly referred to as a " freezing " order; it is a decree of the President, dated April 10, 1940, and relates to transactions in foreign exchange and transfers of credit involving Norway or Denmark, which were made subject to regulation by the Secretary of the Treasury. (5 Fed. Reg. 1400.) On June 14, 1941, Executive Order No. 8785 was issued (6 Fed. Reg. 2897), which amended said Executive Order No. 8389, as amended; it relates to transactions and transfers of credit involving all continental European countries, which are made subject to the control of the Secretary of the Treasury and authorization is issued for requiring reports and collecting information on property in which foreign countries or their nationals have an interest; it contains inhibitions with respect to all transactions involving such countries and their nationals, and their property, except such as are specifically authorized by the Secretary of the Treasury. Section 1 thereof, so far as here deemed pertinent, provides:

" All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if (i) such transactions are by, or on behalf of, or pursuant to the direction of any foreign country designated in this Order, or any national thereof, or (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect: * * *

" B. All payments by or to any banking institution within the United States; * * *

" E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property by any person within the United States." (See, also, U. S. Code, tit. 50, § 5.)

Section 3 of said Executive Order No. 8389, as amended by Executive Order No. 8785, among other things, declares:

" The term ' foreign country designated in this Order ' means a foreign country included in the following schedule, and the term ' effective date of this Order ' means with respect to any such foreign country, or any national thereof, the date specified in the following schedule:

" (j) June 14, 1941 — * * * Germany, Italy * * *."

Subdivision E of section 5 of said Executive Order defines the term " national " to include:

" (ii) Any partnership, association, corporation or other organization, organized under the laws of, or which on or since the effective date of this Order had or has had its principal place of business in such foreign country, or which on or since such effective date was or has been controlled by, or a substantial part of the stock, shares, bonds, debentures, notes, drafts, or other securities or obligations of which, was or has been owned or controlled by, directly or indirectly, such foreign country and/or one or more nationals thereof as herein defined."

By this executive order Italy was brought squarely within the ambit of its provisions and restraints and Credit Consortium as an Italian national. By section 5 (b) of the Trading with the Enemy Act of October 6, 1917 (40 Stat. at Large, 415), as amended, violation of the provisions of this executive order is made a penal offense punishable by fine or imprisonment or both. (See Executive Order, § 8.)

On November 29, 1940, when the sheriff levied under the warrant of attachment the mentioned moneys were free of restraint from transfer and delivery to the sheriff; the restraint against Italy and its nationals only became effective June 14, 1941. As I view the matter, therefore, this Executive Order No. 8389, in its first form, as amended, and as amended by Executive Order No. 8785, in no manner prevented the defendant from turning over the moneys to the sheriff on the date the levy was made. It is not retroactive; that is clear from the plain language as to its effective date. But assuming it was retroactive and effective on the date of the levy, I do not see that this would aid the defendant.

As respects legal impossibility of performance, it is the rule that performance of a contract cannot be compelled where performance would involve a violation of law; but it is subject to the exception that where the intervening illegality can be cured by proper steps taken by one otherwise entitled to urge such illegality, as an excuse for non-performance, it is his duty to and he must take such steps (*Cheatham* v. *Wheeling & L. E. R. Co.*, 37 F. [2d] 593); it is also held that so long as it lies within the power of the promisor to remove the obstacle of performance, legal impossibility of performance does not exist. (*Murphy* v. *North American Co.*, 24 F. Supp. 471.)

The executive orders have the force and effect of law and in their construction and interpretation the accepted canons of statutory construction are to be applied. While the language of the executive order is broad and savors of an all-inclusive interdiction, nonetheless the range of its application is to be viewed and measured in the light of its obvious intent; this concept necessitates consideration of a background which cannot be ignored; the ruthless

invasion of European countries by aggressor Axis powers, followed in particular by the Nazi rapine of the conquered nations, the denunciation thereof by our government, its avowed declaration to aid Great Britain, the known hostility of the Axis powers to the United States, with a virtual state of war existing — it is apparent from this vista that the purpose of the Presidential rescript and Senate imprimatur (54 Stat. at Large, 179; U. S. Code, tit. 12, § 95a) was to harness all the funds and other property in this country of an unholy triumvirate, and their nationals, and, as well, the property of and belonging to invaded and conquered sovereignties and their nationals, thus to deprive a vicious alliance and a potential, if not an actual foe of this nation — and Germany in particular, as its dominant force — of the possession, utilization and disposition of all of these resources which they might conceivably employ to further attain their unlawful objectives; in other words, to prevent the property and funds of such nations " from falling into the hands of the aggressor Axis powers." (*Commission for Polish Relief, Ltd.*, v. *Banca Nationala A Romaniei*, 262 App. Div. 543.)

The quintessence of the order is the sovereign control of the possession, use and disposition of such funds or other property which might or could be employed by these hostile powers for a sinister purpose, or which might or could be used by them to pursue a course deemed by our government to be inimical to the best interests of the nation and detrimental to the peace of the world at large. This is the plain design and intent of the executive order and by no fair, reasonable and sensible construction can an intention be implied therefrom to interrupt the orderly and established processes of the law, or to impair the efficacy of judicial process or to interfere with or obstruct the administration of justice, or to inhibit the delivery of such property into *custodia legis*, or to prevent the courts, their processes and officers, from pursuing and discharging their normal duties and functions. The doctrine of sensible construction has long been recognized.

Even if, as defendant's contention seems to imply, the executive order comes within the realm of *vis major*, from an exercise of governmental authority, I am unable to see that this exonerates the defendant. In the law of contract, where *force majeure* is offered as an excuse for non-performance, it is held that where the injunction, governmental or other restraint does not render performance absolutely impossible it is the duty of the promisor to make a *bona fide* effort to dissolve and be relieved of the restraint which operates to prevent his performance. (*Peckham* v. *Industrial Securities Co.*, 31 Del. 200; 113 A. 799; *South Memphis Land Co.*

v. *McLean Hardwood Lumber Co.*, 179 Fed. 417, 420, 421; *Brown* v. *Ehlinger*, 90 Wash. 585; 156 P. 544.)

By parity of reasoning I am of the opinion that the same principle should obtain where the claim of frustration or impossibility of compliance is made with respect to statutory requirements, due to statutory or equivalent restraint, but which can be removed by proper application taken in behalf of the party pleading it. Such remedy was open to the defendant here under the terms of the executive order (Code of Fed. Reg. tit. 31, chap. 1, part 130) by making application to the Secretary of the Treasury for license to pay over these moneys to the sheriff and it could and should have availed itself of it if it deemed the executive order binding upon it; this duty rested on the defendant and not on the plaintiffs. (Cases, *supra.*)

It is no answer to the failure and refusal of the defendant to deliver these moneys to the sheriff as required by the warrant and statute to say that in the situation in which it found itself it was not required to solve such a question at its peril or to arrive at a decision on the date the warrant is levied. If the defendant deemed itself in a predicament or entertained any doubt as to its duty or obligation in the circumstances, it could have instituted its own independent suit to procure a determination as to the status of the parties and their respective rights and duties (*Marshall* v. *Friedman*, 176 Misc. 32); it could, also, have obtained an administrative ruling with respect thereto. This is clearly shown by defendant's Exhibit E, Circular No. 2221, June 14, 1941, of the Federal Reserve Bank, addressed to all banking institutions and others concerned, in the Second Federal Reserve District, and reading as follows: "Any person in the Second Federal Reserve District having any questions as to whether a particular transaction is permitted only under license should forward his inquiry, with a statement of all appropriate facts and circumstances, either to the Federal Reserve Bank of New York or to the Secretary of the Treasury, Washington, D. C."

Yet the defendant sought neither judicial nor administrative aid in any form to enable it to comply with the executive order and the requirements of the Civil Practice Act; instead it remained idle and indecisive throughout, maintaining a policy of inertia which has resulted in the present suit, but which could readily have been avoided.

I am unable to perceive the interposition by defendant of any valid ground which would operate to deny plaintiffs a recovery. The plaintiffs are entitled to a judgment awarding to the sheriff possession of the attached property, less the sum of $2,170, hereto-

fore recovered by plaintiffs in this action, by way of summary judgment, and less the further sum of $197, expenses incurred by the defendant in connection with the handling of the bonds and which is allowed as a setoff and directing the delivery to the sheriff of the attached property.

As to the disposition of the moneys when received by the sheriff, the judgment will provide and direct that the said property shall be applied by the sheriff to the satisfaction of any judgment which the plaintiffs may obtain in the attachment action (Civ. Prac. Act, § 922, subd. 3), besides the costs and disbursements of this action.

Judgment for plaintiffs accordingly   Appropriate exceptions to defendant.   Thirty days' stay; sixty days to make a case.