## KIYOICHI FUJIKAWA et al. v. SUNRISE SODA WATER WORKS CO. et al.

### CLARK, Atty. Gen., v. SAME.
#### No. 11081.

Circuit Court of Appeals, Ninth Circuit.
Dec. 5, 1946.

---

[3] Commissioner v. Tower, 66 S.Ct. 532.

[4] Lusthaus v. Commissioner, 66 S.Ct. 539.

Montgomery E. Winn and R. K. Murakami, both of Honolulu, T. H. (Vitousek, Pratt & Winn and Murakami & Marumoto, all of Honolulu, T. H., of counsel), for appellants, minority stockholders.

John F. Sonnett, Asst. Atty. Gen., Harry LeRoy Jones and M. S. Isenbergh, Sp. Assts., to the Atty. Gen., David Schwartz, Chief Trial Atty., Dept. of Justice, of Washington, D. C., Ray J. O'Brien, U. S. Atty., Edward A. Towse, Asst. U. S. Atty., both of Honolulu, T. H. (Raoul Berger, Gen. Counsel to Alien Prop. Custodian, of Washington, D. C., of counsel), for T. C. Clark, Atty. Gen.

E. J. Botts and Shiro Kashiwa, both of Honolulu, T. H., for appellees.

Before DENMAN, HEALY, and ORR, Circuit Judges.

DENMAN, Circuit Judge.

These are appeals by the stockholders of Pacific Bank, Inc., and by its receiver from a declaratory judgment in a suit brought by the receiver in which the district court (a) found that the liquidated assets of the bank, after the payment of 100 percent of the claims of its depositors and creditors, were sufficient to pay a statutory 6 percent interest on the claims; and (b) ordered the payment of interest upon the claims for a period from the day after the bank's assets were in custodia legis by virtue of a Treasury Department order of December 7, 1941, revoking the bank's license, to October 28, 1942, when the liquidated assets were ready for distribution.[1]

The Pacific Bank, a banking corporation organized under the laws of the Territory of Hawaii, operated and did business only in the City of Honolulu. It had an authorized capital of $200,000, paid-in capital of $155,000, and deposits of approximately $2,700.00. Close to 72% of the shares of the corporation were owned by Japanese nationals. The executive committee and all of its officers were nationals of Japan. Eight out of nine directors and 60 percent of the depositors were nationals of Japan.

Pursuant to authority vested in him by Section 5(b) of the Trading with the Enemy

---

[1] The appellants assign no error as to the period for which the interest was allowed. The questions raised concern solely the allowance of any interest.

Act, 50 U.S.C.A.Appendix, § 5(b), the President of the United States on April 10, 1940, issued Executive Order 8389, 12 U.S. C.A. § 95a note, forbidding certain transactions by or with designated foreign nationals unless licensed or otherwise authorized by the Secretary of the Treasury. The effect of the order was to "freeze" business and property interests of nationals designated. The order was made applicable to nationals of Japan on July 26, 1940. There was, however, no interruption in businesses owned by nationals of Japan in that immediately on the same day, July 26, 1940, general licenses 68, 56 (see Fed.Reg. 3723), and 66 were issued by the Treasury Department. The Pacific Bank was included in general license 66.

On December 7, 1941, by Public Circular No. 8 of the Treasury Department, all general licenses, specific licenses and authorizations of whatsoever character were revoked in so far as they authorized any transaction by, on behalf of, or for the benefit of, Japan, or any national thereof. General licenses 68, 56 and 66 were therefore revoked by the said order in so far as nationals of Japan were concerned. But immediately thereafter on December 8, 1941, general license H-1 was issued by the authorized representatives of the Treasury Department in the Territory of Hawaii, generally licensing all commercial and agricultural enterprises within the Territory of Hawaii in which nationals of Japan had interests. Most alien Japanese businesses in Hawaii operated under this general license H-1. Financial institutions in which nationals of Japan had interests, such as building and loan associations, industrial loan companies, insurance companies and banks, were not permitted to operate under general license H-1; the Treasury Department, through its Foreign Funds Control division, placed agents in the places of businesses of such concerns.

The National Mortgage and Finance Company, Ltd., the International Building and Loan Association, the Island Insurance Co., Ltd., and the Kyodo Finance Co., all concerns in which nationals of Japan had substantial interests and controls, were typical financial institutions which were not permitted to operate under general license H-1 and the Foreign Funds Control agents entered and supervised. But all of the above concerns applied shortly after December 7, 1941, for licenses and were specially licensed to operate. The Treasury Department provided printed forms marked TFE-1 for such applications.

The record is entirely absent of any effort made by the Pacific Bank to obtain any form of license from the Treasury Department. As a result it remained closed up to February 28, 1942, when the Governor of the Territory of Hawaii, exercising powers delegated to him under Section 5(b) of the Trading with the Enemy Act, as amended by the First War Powers Act of 1941, entered an order of liquidation and appointed Roger E. Brooks as receiver of the said bank. The bank was promptly liquidated. Loans by the bank were collected, the average rate of interest on such loans being 6 percent. During the period of liquidation, interest collected on loans and bonds plus profits from the sale of bonds amounted to $97,916.32.

Appellants assign error first that the evidence sustains their burden of proof that the revocation of the bank's license made it impossible for the directors and officers, the representatives of the stockholders, to repay the depositors the moneys received from them.

We agree with the district court that appellants have not sustained their burden of proof of such impossibility of performance. There was an obligation of the officers of the bank to the depositors to attempt to obtain from the Secretary of the Treasury a license for a limited operation of the bank which would permit the deposit and withdrawal of moneys, as such action was permitted to the two finance companies and the insurance company which applied for and procured such licenses. The rule regarding impossibility of performance as an excuse for not discharging such an obligation is well stated in the case of Richards & Co. v. Wreschner, 174 App.Div. 484, 156 N.Y.S. 1054. The court in that case involving a defendant's failure to provide antimony because of adverse war conditions held, quoting

from Cameron Realty Co. v. Albany, 207 N. Y. 377, 101 N.E. 162, 49 L.R.A.,N.S., 922. ██ "It is a well-settled rule of law that a party must fulfill his contractual obligations. Fraud or mutual mistake, or the fraud of one party and the mistake of the other, or an inadvertence induced by the one party and not negligence on the part of the other, may relieve from an expressed agreement, and an act of God or the law or the interfering or preventive act of the other party may free one from the performance of it; but if what is agreed to be done is possible and lawful the obligation or performance must be met. *Difficulty or improbability of accomplishing the stipulated undertaking will not avail the obligor. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance. The courts will not consider the hardship or the expense or the loss to the one party or the meagerness or the uselessness of the result to the other.* They will neither make nor modify contracts nor dispense with their performance. When a party by his own contract creates a duty or charge upon himself, he is bound to a possible performance of it, because he promised it, and did not shield himself by proper conditions or qualifications." [174 App.Div. 484, 156 N.Y.S. 1056.] (Emphasis supplied.)

The rule applies as well to any obligation, the performance of which is sought to be excused. Dezsofi v. Jacoby, 178 Misc. 851, 36 N.Y.S.2d 672; Brown v. J. P. Morgan & Co., Inc., 177 Misc. 626, 31 N.Y.S.2d 323.

Executive Order 8389 as material with relation to the question herein provides as follows:

"Section 1. All of the following transactions are prohibited, *except as specifically authorized * * * by means of regulations, rulings, instructions, licenses, or otherwise * * *.*" (Emphasis supplied.)

"Section 7. * * * the Secretary of the Treasury * * * is authorized and empowered to prescribe from time to time regulations, rulings, and instructions to carry out the purposes of this Order and to provide therein or otherwise the conditions under which licenses may be granted by or through such officers or agencies as the Secretary of the Treasury may designate, and the decision of the Secretary with respect to the granting, denial or other disposition of an application or license shall be final."

██ Appellants ask us to take judicial notice of a confidential circular of December 9, 1941, written by the Secretary of the Treasury to guide his subordinates, stating that *such subordinates* should not license any Japanese bank. Congress has limited executive orders so affecting banks and other non-official persons of which we may take judicial notice to those published in the Federal Register. 44 U.S.C.A. § 307. The circular was not introduced in evidence in the trial below nor is it shown that it was not there available to the Treasury Department receiver. To seek its probative value on appeal merits the comment of the Second Circuit in Nagle v. United States, 2 Cir., 145 F. 302, 306.

██ However, assuming this appeal to be a trial de novo, we do not see that such instruction to his subordinates in any way relieves the bank officials from seeking a license from the Secretary *himself.* There is no more reason to assume a refusal to consider the situation of a particular bank, closed in the intense excitement of December 9, 1941, than of any other regulated enterprise. The Secretary provided a form of application to himself, as distinguished from his subordinates, for this very purpose. The form opens with the words "To the Secretary of the Treasury, Washington, D. C." It was upon application on this form that the licenses were granted to the two finance companies and the insurance company, each classified by the Secretary with the Pacific Bank as a "banking institution" in Executive Order 8389.

To approve of the officials' failure to apply for a license and then to hold the continued retention of the depositors' moneys as justified because of an impossibility to do otherwise would enable them to say to the stockholders, "As your agents we

have refrained from doing anything to enable the depositors to regain their funds and hence have made certain the saving of your surplus for any interest claims against it—and this although the surplus came in part from the use of the depositors' moneys on which the borrowers paid interest."

■ Failure of the bank's officials in the discharge of such an obligation to the depositors shows an absence of "good faith" of Section 5(b)(2) of the Trading With the Enemy Act, as amended by Sec. 301 of the First War Powers Act, 1941, 55 Stat. 838, 50 U.S.C.A.Appendix, § 5(b)(2), providing that "No person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder."

We agree with the Supreme Court of Michigan that "Good faith includes, not only personal upright mental attitude and clear conscience, but also intention to observe legal duties." Bliss Petroleum Co. v. McNally, 254 Mich. 569, 237 N.W. 53, 55.

■ Appellants do not seriously contend that a surplus of funds in custodia legis, after the payment of the principal of the creditors' claims in a bankruptcy or a receivership in foreclosure proceedings or on a taking over of a bank by a bank commissioner because of his belief of the bank's unsound condition, should not be devoted to the payment of interest on such claims. The rule is stated by the Supreme Court in American Iron Co. v. Seaboard Air Line, 233 U.S. 261, 266, 267, 34 S.Ct. 502, 504, 58 L.Ed. 949. " * * * For that and like reasons, in case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt. ·But that rule did not prevent the running of interest during the receivership; and if, as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid. Even in bankruptcy, and in the face of the argument that the debt-

or's liability on the debt and its incidents terminated at the date of adjudication, and as a fixed liability was transferred to the fund, it has been held, *in the rare instances where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication.* 2 Blackstone's Comm. 488; Cf. Johnson v. Norris, 5 Cir., 190 F. [459], 460 (5), L.R.A.1915B, 884." (Emphasis supplied.) And in Greva v. Rainey, 2 Cal.2d 338, 41 P.2d 328, 330, as "The following authorities, among others, are also pertinent in support of the proposition that the creditors of the bank are entitled to have interest paid out of surplus assets from the date of suspension of business to the time of payment in the absence of an express statutory prohibition, before the rights of the stockholders may be considered, and *under these authorities the result appears to be the same whether the bank has voluntarily closed its doors or possession of its property and business has been taken by an officer vested by law with power to liquidate and distribute its assets, or appointed by a court for that purpose.*" (Emphasis supplied.) Cf. Forschirm v. Merchants & Traders Bank, 206 N.Y. 745, 100 N.E. 1127; Federal Deposit Insurance Corp. v. Citizens State Bank, 8 Cir., 130 F.2d 102, 104. In the bank holiday cases In re First National Bank of Arthur, et al., 7 Cir., 100 F.2d 623; Elliott v. First Inland National Bank of Portland, Oregon, D.C., 32 F.Supp. 839; Barbour v. Thomas, et al., D.C., 7 F.Supp. 271 (affirmed 6 Cir., 86 F.2d 510, pet. for certiorari denied 300 U.S. 670, 57 S.Ct. 513, 81 L.Ed. 877), and Munro v. Post, 2 Cir., 102 F.2d 686, the banks were closed by the statutory holidays without fault at the time of closing.

■ Appellants contend that interest is allowable only in those cases of a breach of obligation *before* the bankruptcy or receivership. The claim is that the debtor holding the surplus is not liable for interest where at the moment of the legal dispossession the disposed party is without fault and it matters not that thereafter there be a fault in a failure to invoke the law or reg-

ulation which may restore the assets of which it has been dispossessed. We do not agree. Assuming the obligation to pay interest applies only in cases of fault, the reason for the payment as well applies in the instant case of breach of obligation to the depositors and creditors subsequent to as in a case of breach before dispossession.

Appellants claim that Brown v. Hiatts, 15 Wall. 177, 21 L.Ed. 128, a civil war case in which interest was refused on obligations between a resident of a Confederate state and one of the United States requires the denial of interest from this bank, an Hawaiian corporation, to its alien depositors and creditors located in Honolulu. We do not agree. In Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 79, 69 L. Ed. 265, the court stated "Our entrance into the war was long subsequent to June 29, 1916, the date of the demand. General representatives, who had long been in charge of the business in this country of Beer, Sondheimer & Co., remained here until after that event. At all times until it was taken over under the act, they had money and property of that firm more than sufficient to make good the seller's damages. * * * The proposition that the enemy defendants, as a matter of law, are entitled to be relieved from interest during the war cannot be sustained. Cf. Ward v. Smith, 7 Wall. 447, 452, 19 L.Ed. 207; Connecticut v. Pennsylvania, 6 Fed.Cas. pages 282, 291, No. 3104; Yeaton v. Berney, 62 Ill. 61, 63; Gates v. Union Bank, 12 Heisk (Tenn.) 325, 330."

It is true that the debt matured in that case before the United States entered the war but the court bases its entire decision upon cases involving "local assets and agencies." The court follows and bases its decision on the doctrine of Ward v. Smith, 7 Wall. 447, 19 L.Ed. 207. All of the four cases cited in the case are cases of "local assets and agencies" as in the case at bar.

We can see no war reason why, if the resident aliens may receive the 100 percent of their principal, they should not receive the interest due thereon.

The judgment is affirmed.